# Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege

As a matter of statutory construction and separation of powers analysis, a United States Attorney is not required to refer a congressional contempt citation to a grand jury or otherwise to prosecute an Executive Branch official who carries out the President's instruction to invoke the President's claim of executive privilege before a committee of Congress.

May 30, 1984

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

## I. Introduction

This memorandum memorializes our formal response to your request for our opinion whether, pursuant to the criminal contempt of Congress statute, 2 U.S.C. §§ 192, 194, a United States Attorney must prosecute or refer to a grand jury a citation for contempt of Congress issued with respect to an Executive Branch official who has asserted a claim of executive privilege in response to written instructions from the President of the United States. Your inquiry originally arose in the context of a resolution adopted by the House of Representatives on December 16, 1982, during the final days of the 97th Congress, which instructed the Speaker of the House of Representatives to certify the report of the Committee on Public Works and Transportation concerning the "contumacious conduct of [the] Administrator, United States Environmental Protection Agency, in failing and refusing to furnish certain documents in compliance with a subpena duces tecum of a duly constituted subcommittee of said committee . . . to the United States Attorney for the District of Columbia, to the end that the Administrator . . . may be proceeded against in the manner and form provided by law." H.R. Res. 632, 97th Cong., 2d Sess. (1982).[1] Section 192 of Title 2, United States Code, provides, in general, that willful failure to produce documents in response to a congressional subpoena shall be a misdemeanor. Section 194 provides that if such a failure is reported to either house of Congress it "shall" be certified to the "appropriate United States attorney whose duty it shall be to bring the matter before the grand jury for its action."

---

[1] Although the December 1982 dispute is now a matter of history, it raises recurring issues.

Your inquiry presents a number of complex issues that will be considered in this memorandum. The first issue is whether the Executive retains some discretion with respect to referral of a contempt of Congress citation to a grand jury. This issue raises questions of statutory construction and the separation of powers with respect to the scope of the Executive's exercise of prosecutorial discretion. The second issue is whether the criminal contempt of Congress statute applies to an Executive Branch official who, on the orders of the President, asserts the President's claim of executive privilege. This issue also involves questions of statutory interpretation and the constitutional separation of powers.

As we have previously discussed with you, and as we explain in detail in this memorandum, we have concluded that, as a matter of both statutory construction and the Constitution's structural separation of powers, a United States Attorney is not required to refer a contempt citation in these circumstances to a grand jury or otherwise to prosecute an Executive Branch official who is carrying out the President's instruction in a factual context such as that presented by the December 16, 1982, contempt citation. First, as a matter of statutory interpretation reinforced by compelling separation of powers considerations, we believe that Congress may not direct the Executive to prosecute a particular individual without leaving any discretion to the Executive to determine whether a violation of the law has occurred. Second, as a matter of statutory interpretation and the constitutional separation of powers, we believe that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege in this context.

Our conclusions are predicated upon the proposition, endorsed by a unanimous Supreme Court less than a decade ago, that the President has the authority, rooted inextricably in the separation of powers under the Constitution, to preserve the confidentiality of certain Executive Branch documents. The President's exercise of this privilege, particularly when based upon the written legal advice of the Attorney General, is presumptively valid. Because many of the documents over which the President may wish to assert a privilege are in the custody of a department head, a claim of privilege over those documents can be perfected only with the assistance of that official. If one House of Congress could make it a crime simply to assert the President's presumptively valid claim, even if a court subsequently were to agree that the privilege claim were valid, the exercise of the privilege would be so burdened as to be nullified. Because Congress has other methods available to test the validity of a privilege claim and to obtain the documents that it seeks, even the threat of a criminal prosecution for asserting the claim is an unreasonable, unwarranted, and therefore intolerable burden on the exercise by the President of his functions under the Constitution.

Before setting out a more detailed explanation of our analysis and conclusions, we offer the caveat that our conclusions are limited to the unique circumstances that gave rise to these questions in late 1982 and early 1983.

Constitutional conflicts within the federal government must be resolved carefully, based upon the facts of each specific case. Although tensions and friction between coordinate branches of our government are not novel and were, in fact, anticipated by the Framers of the Constitution, they have seldom led to major confrontations with clear and dispositive resolutions.

> The accommodations among the three branches of the government are not automatic. They are undefined, and in the very nature of things could not have been defined, by the Constitution. To speak of *lines* of demarcation is to use an inapt figure. There are vast stretches of ambiguous territory.

Frankfurter and Landis, *Power of Congress Over Procedure in Criminal Contempts in "Inferior" Federal Courts*, 37 Harv. L. Rev. 1010, 1016 (1924) (emphasis in original). "The great ordinances of the Constitution do not establish and divide fields of black and white." *Springer* v. *Philippine Islands*, 277 U.S. 189, 209 (1928) (Holmes, J., dissenting). Therefore, although we are confident of our conclusions, prudence suggests that they should be limited to controversies similar to the one to which this memorandum expressly relates, and the general statements of legal principles should be applied in other contexts only after careful analysis.

## II. Background

Because the difficult and sensitive constitutional issues that we consider in this opinion could conceivably be resolved differently depending upon the specific facts of a controversy, this analysis is presented in the context of the December 16, 1982, actions of the House of Representatives. The facts surrounding this dispute will be set out in detail in the following pages.

### A. EPA's Enforcement of the Superfund Act

On December 16, 1982, the House of Representatives cited the Administrator of the Environmental Protection Agency (EPA) because she declined to produce, in response to a broad subcommittee subpoena, a small portion of the subpoenaed documents concerning the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, 9657 (Supp. V 1981) (Superfund Act). The Superfund Act, adopted in December of 1980, authorizes the federal government to take steps to remedy the hazards posed by abandoned and inactive hazardous waste sites throughout the United States.[2] The EPA, which was delegated part of the President's authority to enforce the Superfund Act in August of 1981,[3] has considerable flexibility with respect to

---

[2] Another statute, the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.*, provides federal authority to deal with the current disposal of hazardous industrial wastes.

[3] See Executive Order No. 12316, "Responses to Environmental Damage" (Aug. 14, 1981).

how this goal may be accomplished. EPA may request the Department of Justice to proceed immediately against those responsible for the hazardous waste sites to "secure such relief as may be necessary to abate" an "imminent and substantial endangerment to the public health or welfare or the environment." *See* 42 U.S.C. § 9606. Alternatively, EPA may initiate clean-up efforts itself by using funds from the $1.6 billion Superfund. *See* 42 U.S.C. § 9631. If EPA itself implements the clean-up efforts, it may subsequently sue those responsible for the hazardous waste to recover the clean up cost and, in some instances, may obtain treble damages. *See* 42 U.S.C. § 9607. These two basic enforcement mechanisms are supplemented by other broad enforcement powers, which authorize the issuance of administrative orders "necessary to protect the public health and welfare and the environment" and to require designated persons to furnish information about the storage, treatment, handling, or disposal of hazardous substances. *See* 42 U.S.C. §§ 9606, 9604(e)(1). Finally, the Superfund Act imposes criminal liability on a person in charge of a facility from which a hazardous substance is released, if that person fails to notify the government of the release. *See* 42 U.S.C. § 9603.

Prior to the initiation of judicial proceedings, EPA must undertake intensive investigation and case preparation, including studying the nature and the extent of the hazard present at sites, identifying potentially responsible parties, and evaluating the evidence that exists or that must be generated to support government action. *See* Amended Declaration of Robert M. Perry, Associate Administrator for Legal and Enforcement Counsel and General Counsel, EPA, filed in *United States* v. *House of Representatives*, Civ. No. 82–3583 (D.D.C. Jan. 14, 1983). Many sites apparently involve hundreds of waste generators; hence, the initial investigation of a site can take months and involve the examination of tens of thousands of documents. *Id.*

Based on its initial investigations of hazardous waste sites throughout the country, EPA created a comprehensive national enforcement scheme and developed during 1982 an interim priorities list, which identified the 160 sites that posed the greatest risk to the public health and welfare and the environment.[4] EPA also promulgated enforcement guidelines to direct the implementation of the Superfund Act against these potentially hazardous sites. *See* 47 Fed. Reg. 20664 (1982).

Under this basic enforcement scheme, EPA commenced actual enforcement of the Superfund Act. As part of the enforcement effort with respect to each site, EPA generally develops a strategy for conducting negotiations and litigation consistent with its overall enforcement goals and the individual facts of each particular case. Once a case strategy has been developed, EPA notifies responsible parties that it intends to take action at a site unless the parties undertake an adequate clean up program on their own. Following the issuance of notice letters, EPA typically negotiates with responsible parties to agree on a

---

[4] Subsequently, EPA published a proposed national priorities list (to replace the interim list), which identified the 418 sites that, in EPA's judgment, required priority in use of the Superfund to effect clean up. *See* 47 Fed. Reg. 58476 (1982)

clean up plan. These negotiations may involve hundreds of potentially responsible parties and millions of dollars in clean up costs. Depending upon the strengths and weaknesses of individual cases and the effect on the overall enforcement effort, EPA may decide to settle with some but not all parties and proceed to litigation with a certain number of potential defendants. If EPA decides to bring a lawsuit, it refers the case to the Land and Natural Resources Division of this Department, which is responsible for conducting the actual litigation.[5]

During EPA's enforcement of the Superfund Act, the agency created or received hundreds of thousands of documents concerning various aspects of the enforcement process. Many of these documents concerned the facts relating to specific hazardous waste sites; others involved general agency strategy and policies with respect to the Superfund Act; still others, a small portion of the enforcement files, were attorney and investigator memoranda and notes that contained discussions of subjects such as EPA's enforcement strategy against particular defendants, analyses of the strengths and weaknesses of the government's case against actual or potential defendants, consideration of negotiation and settlement strategy, lists of potential witnesses and their anticipated testimony, and other litigation planning matters. Enforcement officials at both the career and policy level at EPA and in the Land and Natural Resources Division at the Department of Justice determined that some of those documents, which concerned the legal merits and tactics with respect to individual defendants in open enforcement files, were particularly sensitive to the enforcement process and could not be revealed outside the agencies directly involved in the enforcement effort without risking injury to EPA's cases against these actual and potential defendants in particular and the EPA enforcement process in general.[6]

## B. The House Subcommittee's Demands for Enforcement Files

In the midst of EPA's ongoing enforcement efforts under the Superfund Act, the Subcommittee on Oversight and Investigations of the House Committee on Public Works and Transportation (Public Works Subcommittee), chaired by Rep. Levitas, began hearings to review EPA enforcement of the Act. In the course of these hearings, the Public Works Subcommittee first demanded access to, and then subpoenaed, a wide range of documents concerning enforcement of the Superfund Act with respect to the 160 sites that were on the

---

[5] We understand that as of January 14, 1983, EPA had sent more than 1,760 notice letters, undertaken Superfund financed action at 112 sites involving the obligation of in excess of $236 million, instituted Superfund claims in 25 judicial actions, and obtained one criminal conviction. As of the early months of 1983, EPA and the Department of Justice had reached settlements in 23 civil actions providing for the expenditure of more than $121 million to conduct clean up operations and were actively negotiating with responsible parties concerning the clean up of 56 sites throughout the country. *See* Amended Declaration of Robert M. Perry, Associate Administrator for Legal and Enforcement Counsel and General Counsel of the EPA, filed in *United States* v. *House of Representatives*, Civ. No. 82–3583 (D.D.C. Jan. 14, 1983).

[6] *Id.*

agency's interim priorities list. The documents demanded by the Public Works Subcommittee included not only documents concerning the facts relating to these sites and EPA's general policies, but also the sensitive material contained in open case files that set out discussions concerning case strategy with respect to actual and potential defendants.[7] The Public Works Subcommittee subpoena was dated November 16, 1982, and was served on November 22, 1982. It called for production of the subpoenaed documents eleven days later on December 2, 1982. The EPA Administrator responded to the Public Works Subcommittee's subpoena by offering to provide the Public Works Subcommittee with access to an estimated 787,000 pages of documents within the scope of the subpoena.[8] The EPA and the Land and Natural Resources Division officials responsible for conducting EPA enforcement litigation determined, however, that release outside the enforcement agencies of a limited number of the most sensitive enforcement documents contained in open files concerning current and prospective defendants would impair EPA's ongoing enforcement efforts and prevent EPA and the Department of Justice from effectively implementing the Superfund Act.

Therefore, in accordance with the explicit guidelines adopted by the President to govern possible claims of executive privilege, see Memorandum re: Procedures Governing Responses to Congressional Requests for Information (Nov. 4, 1982), EPA suggested that some of the documents be withheld under a claim of executive privilege and consulted with this Office and the Office of the Counsel to the President in order to determine whether such a claim might be asserted to avoid impairing the constitutional responsibility of the President to take care that the laws be faithfully executed. A further review of the documents in question by enforcement officials at EPA and the Land and Natural Resources Division was then undertaken to confirm that the particular documents selected for consideration for an executive privilege claim were, in the judgment of those officials, sufficiently sensitive that their disclosure outside the Executive Branch might adversely affect the law enforcement process. The documents were then reviewed by officials in this Office and officials in the Office of the Counsel to the President to confirm that the documents were of the type described by the enforcement officials. Various unsuccessful efforts were thereafter made to resolve the dispute short of a final confrontation. The President, based upon the unanimous recommendation of all Executive Branch officials involved in the process, ultimately determined to assert a claim of executive privilege with respect to 64 documents from open enforcement files that had been identified as sufficiently enforcement sensitive

---

[7] The subpoena required the EPA Administrator to produce: all books, records, correspondence, memoranda, papers, notes and documents drawn or received by the Administrator and/or her representatives since December 11, 1980, the date of enactment of the Superfund Act, including duplicates and excepting shipping papers and other commercial or business documents, contractor and/or other technical documents, for those sites listed as national priorities pursuant to Section 105(8)(B) of the Superfund Act. See United States v. House of Representatives, 556 F. Supp. 150, 151 (D.D.C. 1983).

[8] See Testimony of Administrator Gorsuch before the Public Works Subcommittee, attached as Exhibit C to Declaration of Robert M. Perry, supra.

as of the return date of the subpoena that their disclosure might adversely affect pending investigations and open enforcement proceedings. The President implemented this decision in a memorandum dated November 30, 1982, to the EPA Administrator, which instructed her to withhold the particularly sensitive documents from disclosure outside the Executive Branch as long as the documents remained critical to ongoing or developing enforcement actions. The legal basis for this decision was explained in letters from the Attorney General on November 30, 1982, to the House Public Works Subcommittee and one other House subcommittee.[9] On December 2, 1982, 64 of the most sensitive documents were withheld from the Subcommittee.[10]

## C. The Contempt of Congress Proceedings in the House of Representatives

The President's assertion of executive privilege, and the Attorney General's explanation of the law enforcement considerations and constitutional justification for the decision not to release the documents outside the Executive Branch while enforcement proceedings were ongoing, did not dissuade the congressional subcommittees from pressing their demands for the withheld material. After the EPA Administrator asserted the President's claim of privilege at a December 2, 1982, Public Works Subcommittee hearing, the Subcommittee immediately approved a contempt of Congress resolution against her. The full Committee did likewise on December 10, 1982, and rejected a further proposal by the Department of Justice to establish a formal screening process and briefings regarding the contents of the documents.[11] The full House adopted the contempt of Congress resolution on December 16, 1982,[12] and the follow-

---

[9] *See* Letters to Hon. Elliott H. Levitas and Hon. John D. Dingell from Attorney General William French Smith (Nov. 30, 1982). The Subcommittee on Oversight and Investigations of the House Energy and Commerce Committee (Energy and Commerce Subcommittee), chaired by Representative John D. Dingell, was pursuing a parallel demand for similar documents relating to enforcement of the Superfund Act with respect to certain specific sites that were among the 160 on the interim priorities list. While the Energy and Commerce Subcommittee sought documents relative to three specific hazardous waste sites, the Public Works Subcommittee subpoena demanded production of virtually all documents for all 160 sites. The President's assertion of executive privilege applied to both subpoenas. Although the Energy and Commerce Subcommittee approved a contempt of Congress resolution against the EPA Administrator, this resolution never reached the full Committee or the floor of the House of Representatives.

[10] As of that date, EPA had been able to examine only a portion of the hundreds of thousands of pages of documents that had been subpoenaed. The 64 documents that were withheld were those among the subpoenaed documents that had been reviewed and determined to fall within the President's instruction not to produce documents the release of which would adversely affect ongoing enforcement proceedings *See* Amended Declaration of Robert M. Perry, *supra*

[11] *See* Letter to Hon. Elliott H. Levitas from Robert A. McConnell, Assistant Attorney General, Office of Legislative Affairs (Dec. 9, 1982).

[12] The contempt resolution stated:

Resolved, That the Speaker of the House of Representatives certify the report of the Committee on Public Works and Transportation as to the contumacious conduct of Anne M. Gorsuch, as Administrator, United States Environmental Protection Agency, in failing and refusing to furnish certain documents in compliance with a subpena duces tecum of a duly constituted subcommittee of said committee served upon Anne M. Gorsuch, as Administrator, United States Environmental Protection Agency, and as ordered by the subcommittee, together with all of the facts in

Continued

107

ing day Speaker O'Neill certified the contempt citation to the United States Attorney for the District of Columbia for prosecution under the criminal contempt of Congress statute.

## D. The Criminal Contempt of Congress Statute

The criminal contempt of Congress statute contains two principal sections, 2 U.S.C. §§ 192 & 194.[13] Section 192, which sets forth the criminal offense of contempt of Congress, provides in pertinent part:

> Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House . . . or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months.

Section 194 purports to impose mandatory duties on the Speaker of the House or the President of the Senate, as the case may be, and the United States Attorney, to take certain actions leading to the prosecution of persons certified by a house of Congress to have failed to produce information in response to a subpoena. It provides:

> Whenever a witness summoned as mentioned in section 192 of this title fails to appear to testify or fails to produce any books, papers, records, or documents, as required, or whenever any witness so summoned refuses to answer any question pertinent to the subject under inquiry before either House . . . or any committee or subcommittee of either House of Congress, and the fact of such failure or failures is reported to either House while Congress is in session or when Congress is not in session, a statement of fact constituting such failure is reported and filed with the President of the Senate or the Speaker of the House, *it shall be the duty of the said President of the Senate or the Speaker of the House*, as the case may be, *to certify, and he shall so certify, the statement of facts* aforesaid under the seal of the

---

[12] (. . . continued)
connection therewith, under seal of the House of Representatives, to the United States attorney for the District of Columbia, to the end that Anne M. Gorsuch, as Administrator, United States Environmental Protection Agency, may be proceeded against in the manner and form provided by law.

128 Cong. Rec. 31754 (1982).

[13] A third provision, 2 U.S.C. § 193, which denies the existence of any testimonial privilege for a witness to refuse to testify on the ground that this testimony would disgrace him, is not relevant to the issues discussed in this memorandum.

Senate or House, as the case may be, *to the appropriate United States attorney, whose duty it shall be to bring the matter before the grand jury for its action.*

(Emphasis added.)

*E. The Department of Justice Civil Suit*

Immediately after the House passed the resolution adopting the finding that the EPA Administrator was in contempt of Congress, the Department of Justice filed a civil suit in the United States District Court for the District of Columbia to obtain a ruling that "insofar as [the EPA] Administrator . . . did not comply with the Subpoena, her non-compliance was lawful" because of a valid Presidential claim of executive privilege.[14] The House moved to dismiss the Department's complaint on jurisdictional grounds, and the Department cross moved for summary judgment on the merits. In a letter to Speaker O'Neill dated December 27, 1982, the United States Attorney indicated that during the pendency of the lawsuit, he would take no further action with respect to the Speaker's referral of the contempt citation. The Speaker responded in a letter dated January 4, 1983, in which he took the position that the United States Attorney must, as a matter of law, immediately refer the matter to a grand jury.

The trial court responded to the cross-motions for dismissal and summary judgment by exercising its discretion under equitable rules of judicial restraint not to accept jurisdiction over the lawsuit, and it dismissed the suit. The court concluded:

> When constitutional disputes arise concerning the respective powers of the Legislative and Executive Branches, judicial intervention should be delayed until all possibilities for settlement have been exhausted. . . .
>
> The difficulties apparent in prosecuting [the] Administrator . . . for contempt of Congress should encourage the two branches to settle their differences without further judicial involvement.

*United States* v. *House of Representatives*, 556 F. Supp. 150, 152–53 (D.D.C. 1983). No appeal was taken.[15]

---

[14] *See* Amended Complaint in *United States* v. *House of Representatives*, Civ. No. 82–3583 (D.D.C. Dec. 29, 1982).

[15] Although the United States Court of Appeals for the District of Columbia Circuit previously had been willing to entertain a civil action to resolve a conflict between a congressional subpoena for documents and a Presidential claim of executive privilege when the action was brought by a congressional committee, *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725 (D.C. Cir 1974) (en banc), the trial court decision in the EPA matter casts some doubt on the viability of such an action when Congress, as in this case, does not wish to resolve the controversy in a civil suit. We must assume, for the purpose of this opinion, that a civil suit is an avenue that is open to Congress, but closed to the Executive, absent a legislature willing to have the matter resolved in a civil proceeding.

Of course, the courts might be more amenable to a civil action challenging a contempt citation if they felt that a criminal prosecution in this context was untenable. The district court judge in the EPA matter noted but did not attempt to consider in depth the "difficulties" of prosecuting an executive official for carrying out the President's constitutional responsibility.

## F. Resolution of the EPA Dispute

Subsequent to the trial court decision, the two branches engaged in negotiations to reach a compromise settlement. The parties eventually reached an agreement under which the Public Works Subcommittee would have limited access to the withheld documents and would sponsor a resolution to "withdraw" the contempt citation against the EPA Administrator. Pursuant to the agreement, the Subcommittee reviewed the documents, and the House later adopted a resolution withdrawing the contempt citation. H.R. Res. 180, 98th Cong., 1st Sess. (Aug. 3, 1983). The issue whether the House of Representatives in the 98th Congress could "withdraw" the contempt citation of the House during the 97th Congress was never resolved.

During the pendency of the lawsuit and the subsequent settlement negotiations, the United States Attorney for the District of Columbia refrained from referring the contempt citation to the grand jury. The United States Attorney took the position that referral would have been inappropriate during that period and that the statute left him with discretion to withhold referral. *See* Testimony of Stanley S. Harris before the House Committee on Public Works and Transportation, 98th Cong., 1st Sess. 100–07 (June 16, 1983). Following the passage of the resolution withdrawing the contempt citation, "the relevant facts and documents were presented . . . to a federal grand jury, which voted unanimously not to indict [the EPA Administrator]." Letter from Stanley S. Harris, United States Attorney, District of Columbia, to Honorable Thomas P. O'Neill, Jr., Speaker of the House of Representatives (Aug. 5, 1983).

### III. Generally Applicable Legal Principles: The Separation of Powers, the Duties of the Executive to Enforce the Law, and the Derivation and Scope of the Principles of Prosecutorial Discretion and Executive Privilege

## A. The Separation of Powers

The basic structural concept of the United States Constitution is the division of federal power among three branches of government. Although the expression "separation of powers" does not actually appear in the Constitution, the Supreme Court has emphasized that the separation of powers "is at the heart of our Constitution," and has recognized "the intent of the Framers that the powers of the three great branches of the National Government be largely separate from one another." *Buckley* v. *Valeo*, 424 U.S. 1, 119–20 (1976). It needs little emphasis that the separation of powers doctrine is vital to any analysis of the relative responsibilities of the branches of our government, *inter se*. In *The Federalist* No. 47, James Madison, who believed that "no political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty" than the concept of the separation of powers, defended this tripartite arrangement in the Constitution by citing

110

Montesquieu's well-known maxim that the legislative, executive, and judicial departments should be separate and distinct:

> The reasons on which Montesquieu grounds his maxim are a further demonstration of his meaning. "When the legislative and executive powers are united in the same person or body," says he, "there can be no liberty, because apprehensions may arise lest *the same* monarch or senate should *enact* tyrannical laws to *execute* them in a tyrannical manner." Again: "Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for *the judge* would then be *the legislator.* Were it joined to the executive power, *the judge* might behave with all the violence of *an oppressor.*"

*The Federalist* No. 47, at 303 (J. Madison) (C. Rossiter ed. 1961); *see Buckley v. Valeo,* 424 U.S. at 120–21.[16]

Of the three branches of the new government created in Philadelphia in 1787, the legislature was regarded as the most intrinsically powerful, and the branch with powers that required the exercise of the greatest precautions.

Madison warned that the "legislative department is everywhere extending the sphere of its activity and drawing all power into its impetuous vortex." *The Federalist* No. 48, *supra,* at 309. He admonished that because of their experiences in England, the founders of the thirteen colonies had focused keenly on the danger to liberty from an "overgrown and all-grasping prerogative of an hereditary magistrate, supported and fortified by an hereditary branch of the legislative authority," but had tended to ignore the very real dangers from "legislative usurpations, which, by assembling all power in the same hands, must lead to the same tyranny as is threatened by executive usurpations." *Id.* Reflecting the views of many of his colleagues, Madison believed that although the risk of tyranny would naturally come from the King in an hereditary monarchy, in a representative republic, like that created by the constitutional convention, in which executive power was "carefully limited, both in the extent and duration of its power," the threat to liberty would come from the legislature,

> which is inspired, by a supposed influence over the people, with an intrepid confidence in its own strength; which is sufficiently numerous to feel all the passions which actuate a multitude, yet not so numerous as to be incapable of pursuing the objects of its passions by means which reason prescribes; it is against the enterprising ambition of this department that the people ought to indulge all their jealousy and exhaust all their precautions.

*Id.*

---

[16] Madison characterized Montesquieu as the "oracle who is always consulted and cited on [the] subject [of the separation of powers]." *See The Federalist* No. 47, *supra,* at 301.

The Framers feared that the legislature's power over the purse would foster a dependence by the executive departments on the legislature "which gives still greater facility to encroachments" by the legislature on the powers of the Executive. *Id.* at 310. The concerns of the Framers with respect to the power of the legislature have been recognized by the Supreme Court. The Court, citing many of the above statements, has observed that because of the Framers' concerns about the potential abuse of legislative power, "barriers had to be erected to ensure that the legislature would not overstep the bounds of its authority and perform functions of the other departments." *United States* v. *Brown*, 381 U.S. 437, 444 (1965). Justice Powell noted that "during the Confederation, the States reacted by removing power from the executive and placing it in the hands of elected legislators. But many legislators proved to be little better than the Crown." *INS* v. *Chadha*, 462 U.S. 917, 961 (1983) (Powell, J. concurring). After citing several specific legislative abuses that had been of particular concern to the Framers, Justice Powell concluded that it "was to prevent the recurrence of such abuses that the Framers vested the executive, legislative, and judicial powers in separate branches." *Id.* at 962.

Thus, the careful separation of governmental functions among three branches of government was a very deliberate and vital structural step in building the Constitution. The Framers understood human nature and anticipated that well-intentioned impulses would lead each of the branches to attempt to encroach on the powers allocated to the others. They accordingly designed the structure of the Constitution to contain intrinsic checks to prevent undue encroachment wherever possible. Particular care was taken with respect to the anticipated tendency of the Legislative Branch to swallow up the Executive. The Framers did not wish the Legislative Branch to have excessive authority over the individual decisions respecting the execution of the laws: "An *elective despotism* was not the government we fought for." T. Jefferson, *Notes on the State of Virginia* 120 (Univ. N.C. Press ed. 1955)[17] The constitutionally prescribed separation of powers creates enforceable abuses that had been of particular concern to the Framers, Justice Powell concluded that it "was to prevent the recurrence of such abuses that the Framers vested the executive, legislative, and judicial powers in separate branches." *Id.* The division of delegated powers was designed "to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *INS* v. *Chadha*, 462 U.S. at 951. The doctrine of separated powers "may be violated in two ways. One branch may interfere impermissibly with the other's performance of its consti-

[17] It is noteworthy, at least from an historical perspective, that the House of Representatives, because of its immense powers, was considered to be the governmental body least vulnerable to encroachments by other segments of government and, at the same time, because of its popular origin and frequent renewal of authority by the people, the body whose encroachment on the other branches would be least distrusted by the public. The Supreme Court later noted:

> It is all the more necessary, therefore, that the exercise of power by this body, when acting separately from and independently of all other depositories of power, should be watched with vigilance, and when called in question before any other tribunal having the right to pass upon it that it should receive the most careful scrutiny.

*Kilbourn* v. *Thompson*, 103 U.S. 168, 192 (1881).

112

tutionally assigned function. Alternatively, the doctrine may be violated when one branch assumes a function that more properly is entrusted to another. *Id.* at 963 (Powell, J. concurring) (citations omitted). Although the Supreme Court has recognized that "a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively," it has also emphasized that the Court "has not hesitated to enforce the principle of separation of powers embodied in the Constitution when its application has proved necessary for the decision of cases or controversies properly before it." *Buckley* v. *Valeo*, 424 U.S. at 121, 123. Therefore, although the Constitution does not contemplate "a complete division of authority between the three branches," each branch retains certain core prerogatives upon which the other branches may not transgress. *Nixon* v. *Administrator of Gen. Servs.*, 433 U.S. 425, 443 (1977). Each branch must not only perform its own delegated functions, but each has an additional duty to resist encroachment by the other branches. "The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, *must* be resisted." *INS* v. *Chadha*, 462 U.S. at 951 (emphasis added).

## B. The Duties of the Executive to Enforce the Law

The fundamental responsibility and power of the Executive Branch is the duty to execute the law. Article II, § 1 of the Constitution expressly vests the executive power in the President. Article II, § 3 commands that the President "take Care that the Laws be faithfully executed." Enforcement of the laws is an inherently executive function, and by virtue of these constitutional provisions, the Executive Branch has the exclusive constitutional authority to enforce federal laws. Since the adoption of the Constitution, these verities have been at the heart of the general understanding of the Executive's constitutional authority. During the debates on the Constitution, James Wilson noted that the "only powers he conceived strictly executive were those of executing the laws." 1 M. Farrand, *The Records of the Federal Convention of 1787*, at 65–66 (1937). During the first Congress, James Madison stated that "if any power whatsoever is in its nature executive, it is the power of appointing, overseeing, and controlling those who execute the laws." 1 *Annals of Congress* 481 (1789). The Supreme Court has recognized this fundamental constitutional principle. In *Springer* v. *Philippine Islands*, 277 U.S. 189 (1928), the Court observed:

> Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement. The latter are executive functions.

*Id.* at 202. More recently, Judge Wilkey, writing for a unanimous panel of the United States Court of Appeals for the District of Columbia Circuit in a decision later affirmed by the Supreme Court, recognized that the Constitution

prevents Congress from exercising its power of "oversight, with an eye to legislative revision," in a manner that amounts to "shared administration" of the law. *Consumer Energy Council of America* v. *Federal Energy Regulatory Commission*, 673 F.2d 425, 474 (D.C. Cir. 1982), *aff'd sub nom. Process Gas Consumers Group* v. *Consumer Energy Council of America*, 43 U.S. 1216 (1983). It thus seems apparent that the drafters of the Constitution intended clearly to separate the power to adopt laws and the power to enforce them and intended to place the latter power exclusively in the Executive Branch.[18] As a practical matter, this means that there are constitutional limits on Congress' ability to take actions that either disrupt the ability of the Executive Branch to enforce the law or effectively arrogate to Congress the power of enforcing the laws.

## C. The Derivation and Scope of Prosecutorial Discretion and Executive Privilege

The issues addressed by this memorandum involve two important constitutional doctrines that spring from the constitutional limits imposed by the separation of powers and the Executive's duty to enforce the laws: prosecutorial discretion and executive privilege.

### 1. Prosecutorial Discretion

The doctrine of prosecutorial discretion is based on the premise that because the essential core of the President's constitutional responsibility is the duty to enforce the laws, the Executive Branch has exclusive authority to initiate and prosecute actions to enforce the laws adopted by Congress. That principle was reaffirmed by the Supreme Court in *Buckley* v. *Valeo*, 424 U.S. 1 (1976), in which the Court invalidated the provision of the Federal Election Act that vested the appointment of certain members of the Federal Election Commission in the President *pro tempore* of the Senate and the Speaker of the House. In so holding, the Court recognized the exclusively executive nature of some of the Commission's powers, including the right to commence litigation:

> The Commission's enforcement power, exemplified by its discretionary power to seek judicial relief, is authority that cannot possibly be regarded as merely in aid of the legislative function of Congress. A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to "take care that the laws be faithfully executed." Art. II, § 3.

424 U.S. at 138.

---

[18] Of equal concern was the need to separate the judicial power from the executive power. The drafters intended to preserve the impartiality of the judiciary as "neutral arbiters in the criminal law" by separating the judiciary from the prosecutorial function. *Nader* v. *Saxbe*, 497 F.2d 676, 679 n.18 (D.C Cir. 1974).

The Executive's exclusive authority to prosecute violations of the law gives rise to the corollary that neither the Judicial nor Legislative Branches may directly interfere with the prosecutorial discretion of the Executive by directing the Executive Branch to prosecute particular individuals. This principle was explained in *Smith* v. *United States*, 375 F.2d 243 (5th Cir.), *cert. denied*, 389 U.S. 841 (1967), in which the court considered the applicability of the Federal Tort Claims Act to a prosecutorial decision not to arrest or prosecute persons injuring plaintiff's business. The court ruled that the government was immune from suit under the discretionary decision exception of the Act on the ground that the Executive's prosecutorial discretion was rooted in the separation of powers under the Constitution:

> The President of the United States is charged in Article 2, Section 3, of the Constitution with the duty to "take Care that the Laws be faithfully executed." The Attorney General is the President's surrogate in the prosecution of all offenses against the United States. . . . The discretion of the Attorney General in choosing whether to prosecute or not to prosecute, or to abandon a prosecution already started, is absolute. . . . This discretion is required in all cases.

> We emphasize that this discretion, exercised in even the lowliest and least consequential cases, can affect the policies, duties, and success of a function placed under the control of the Attorney General by our Constitution and statutes.

375 F.2d at 246–47. The court went on to state that this prosecutorial discretion is protected "no matter whether these decisions are made during the investigation or prosecution of offenses." *Id.* at 248.

The limits and precise nature of the Executive's prosecutorial discretion are discussed in greater detail below. At this point in our examination of the issues considered in this memorandum, it is sufficient to observe that meaningful and significant separation of powers issues are raised by a statute that purports to direct the Executive to take specified, mandatory prosecutorial action against a specific individual designated by the Legislative Branch.

## 2. Executive Privilege

The doctrine of executive privilege is founded upon the basic principle that in order for the President to carry out his constitutional responsibility to enforce the laws, he must be able to protect the confidentiality of certain types of documents and communications within the Executive Branch. If disclosure of certain documents outside the Executive Branch would impair the President's ability to fulfill his constitutional duties or result in the impermissible involvement of other branches in the enforcement of the law, then the President must be able to claim some form of privilege to preserve his constitutional preroga-

tives. This "executive privilege" has been explicitly recognized by the Supreme Court, which has stated that the privilege is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States* v. *Nixon*, 418 U.S. 683, 708 (1974). We believe that it is beyond peradventure that the constitutionally mandated separation of powers permits the President to prevent disclosure of certain Executive Branch documents under the doctrine of executive privilege and that the ability to assert this privilege is fundamental to the President's ability to carry out his constitutionally prescribed duties.

The Supreme Court has suggested that in some areas the President's executive privilege may be absolute and in some circumstances it is a qualified privilege that may be overcome by a compelling interest of another branch. *United States* v. *Nixon*, 418 U.S. at 713; *see also Senate Select Comm. on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc). Nevertheless, the unanimous Supreme Court decision in *Nixon* clearly stands for the proposition that there is a privilege, that it stems from the separation of powers, and that it may be invoked (although perhaps overridden by a court) whenever the President finds it necessary to maintain the confidentiality of information within the Executive Branch in order to perform his constitutionally assigned responsibilities.[19]

The scope of executive privilege includes several related areas in which confidentiality within the Executive Branch is necessary for the effective execution of the laws. First, as the Supreme Court has held, the privilege protects deliberative communications between the President and his advisors. The Court has identified the rationale for this aspect of the privilege as the valid need for protection of communications between high government officials and those who advise and assist them in the performance of their manifold duties; the importance of this confidentiality is too plain to require further discussion. Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process. *United States* v. *Nixon*, 418 U.S. at 705 (footnotes omitted).

Another category of Executive Branch material that is subject to a President's claim of privilege is material necessary "to protect military, diplomatic, or sensitive national security secrets." *United States* v. *Nixon*, 418 U.S. 683, 706 (1974). In *Nixon*, the Court stated:

> As to those areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities. In *C. & S. Air Lines* v. *Waterman S.S. Corp.*, 333 U.S. 103, 111

---

[19] Presidents have invoked the privilege throughout our history for a variety of reasons. *See, e.g.,* "History of Refusals by Executive Branch to Provide Information Demanded by Congress," 6 Op. O.L.C. 751 (1982); Memorandum from John Harmon, Assistant Attorney General, Office of Legal Counsel, to Robert Lipschutz, Counsel to the President (June 8, 1977); Position of the Executive Department Regarding Investigative Reports, 40 Op. Att'y Gen. 45 (1941).

116

(1948), dealing with Presidential authority involving foreign policy considerations, the Court said:

> "The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret."

In *United States* v. *Reynolds*, 345 U.S. 1 (1953), dealing with a claimant's demand for evidence in a Tort Claims Act case against the Government, the Court said:

> "It may be possible to satisfy the court, from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged. When this is the case, the occasion for the privilege is appropriate, and the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers." *Id.* at 10.

> No case of the Court, however, has extended this high degree of deference to a President's generalized interest in confidentiality. Nowhere in the Constitution, as we have noted earlier, is there any explicit reference to a privilege of confidentiality, yet to the extent this interest relates to the effective discharge of a President's powers, it is constitutionally based.

418 U.S. at 710–11.

An additional important application of executive privilege, which, as noted earlier, relates centrally to the discharge of the President's constitutional duties, involves open law enforcement files. Since the early part of the 19th century, Presidents have steadfastly protected the confidentiality and integrity of investigative files from untimely, inappropriate, or uncontrollable access by the other branches, particularly the legislature.[20] The basis for this application

---

[20] As explained by Attorney General (later, Supreme Court Justice) Robert Jackson in April 1941:

> Disclosure of the reports could not do otherwise than seriously prejudice law enforcement. Counsel for a defendant or prospective defendant, could have no greater help than to know how much or how little information the Government has, and what witnesses or sources of information it can rely upon.

40 Op. Att'y Gen. 45, 46 (1941). As similarly expressed a few years later by Deputy Assistant Attorney General Kauper:

> Over a number of years, a number of reasons have been advanced for the traditional refusal of the Executive to supply Congress with information from open investigational files. Most impor-
> Continued

117

of the privilege is essentially the same as for all aspects of executive privilege; the Executive's ability to enforce the law would be seriously impaired, and the impermissible involvement of other branches in the execution and enforcement of the law would be intolerably expanded, if the Executive were forced to disclose sensitive information on case investigations and strategy from open enforcement files.

IV. The Duty of the Executive Branch When an Executive Official Has Been Cited for Contempt of Congress for Asserting the President's Claim of Executive Privilege

## A. Prosecutorial Discretion

The first specific question that is presented by the circumstances that gave rise to this memorandum is whether the United States Attorney is required to refer every contempt of Congress citation to a grand jury. This question raises issues of statutory construction as well as the constitutional limits of prosecutorial discretion. We deal first with the statutory questions.

As a preliminary matter, we note that § 194 does not on its face actually purport to require the United States Attorney to proceed with the prosecution of a person cited by a house of Congress for contempt; by its express terms the statute discusses only referral to a grand jury. Even if a grand jury were to return a true bill, the United States Attorney could refuse to sign the indictment and thereby prevent the case from going forward. *United States* v. *Cox*, 342 F.2d 167 (5th Cir.) (en banc), *cert. denied*, 381 U.S. 935 (1965); *In re Grand Jury, January, 1969*, 315 F. Supp. 662 (D. Md. 1970). *See* Hamilton & Grabow, *A Legislative Proposal for Resolving Executive Privilege Disputes Precipitated by Congressional Subpoenas*, 21 Harv. J. on Legis. 145, 155 (1984). Thus, as a matter of statutory interpretation, there is no doubt that the contempt of Congress statute does not require a prosecution; the only question is whether it requires referral to the grand jury.[21]

---

[20] (. . . continued)

tant, the Executive cannot effectively investigate if Congress is, in a sense, a partner in the investigation. If a congressional committee is fully apprised of all details of an investigation as the investigation proceeds, there is a substantial danger that congressional pressures will influence the course of the investigation.

Memorandum for the Deputy Counsel to the President from Deputy Assistant Attorney General Kauper re: Submission of Open CID Investigation Files (Dec. 19, 1969). This significant constitutional privilege provides a foundation for our discussion below of the penalties that Congress may attach to the President's assertion of the privilege in response to a congressional subpoena.

[21] Although it is by no means certain as a matter of law, if the case were referred to a grand jury, the United States Attorney might be required to take certain steps short of signing the indictment, and the grand jury's decision might well become public. In *Cox*, a majority of the court (made up of the three dissenting judges and one concurring judge) took the view that the United States Attorney could be required to prepare an indictment for use by the grand jury. In addition, the district court in *In re Grand Jury, supra*, held that even though the United States Attorney could not be required to sign an indictment, in the circumstances of that case "the substance of the charges in the indictment should be disclosed, omitting certain portions as to which

Continued

118

## 1. Previous Department of Justice Positions Concerning Prosecutorial Discretion Under the Contempt of Congress Statute

In the past, the Department of Justice has taken the position that if Congress cited an executive officer for contempt because of an assertion of executive privilege and "the Department determined to its satisfaction that the claim was rightfully made, it would not, in the exercise of its prosecutorial discretion, present the matter to a grand jury." Testimony of Assistant Attorney General (now Solicitor General) Rex Lee, *Hearings on Representation of Congress and Congressional Interests in Court, Before the Subcomm. on Separation of Powers of the Senate Committee on the Judiciary*, 94th Cong., 2d Sess. 8 (1976).

This principle of prosecutorial discretion under the contempt of Congress statute was followed by the Department in the cases of three officials of the Port of New York Authority who were cited for contempt of Congress in 1960 for refusing to produce documents to the House Judiciary Committee. As a part of an investigation of the Port Authority, which had been established by an interstate compact approved by Congress, the Judiciary Committee subpoenaed a large number of documents concerning the Port Authority's operations, most of which the Port Authority declined to produce on the orders of the governors of New York and New Jersey (the states within which the Port Authority was located). Because of the failure to produce the documents, the Committee recommended, and the House adopted, contempt resolutions against three principal officials of the Port Authority.[22] On August 23, 1960, these resolutions were referred to the United States Attorney for prosecution. *See* N.Y. Times, Aug. 24, 1960, at 1. The United States Attorney never referred any of these citations to the grand jury. On November 16, 1960, the Department of Justice announced that it would proceed against the officials by information

---

[21] (. . . continued)

the Court, in the exercise of its discretion, concludes that the public interest in disclosure is outweighed by the private prejudice to the persons involved, none of whom are charged with any crime in the proposed indictment." 315 F Supp. at 678–79. Under this analysis, if the contempt citation were to reach a grand jury and the grand jury were to vote a true bill, a court might be able to require the United States Attorney to prepare an indictment and then might order the disclosure of that indictment as voted by the grand jury. For the reasons set out in our discussion of prosecutorial discretion, the court could not, however, order the United States Attorney to prosecute.

Because the contempt of Congress statute does not require the United States Attorney to refer to a grand jury a citation for contempt of Congress issued to an executive official who has asserted the President's claim of executive privilege, we have not attempted to determine definitively what additional steps, if any, the United States Attorney could be required to take if such a matter were referred to a grand jury.

[22] See 106 Cong. Rec. 17313 (1960) (citation against Austin J. Tobin, Executive Director of the Authority); *id.* at 17316 (citation against S. Sloan Colt, Chairman of the Board); *id.* at 17319 (citation against Joseph G. Carty, Secretary). The contempt resolution in each case read as follows:

> Resolved, That the Speaker of the House of Representatives certify the report of the Committee on the Judiciary as to the contumacious conduct of [name] in failing and refusing to furnish certain documents in compliance with a subpena duces tecum of a duly constituted subcommittee of said committee served upon him and as ordered by the subcommittee, together with all of the facts in connection therewith, under seal of the House of Representatives, to the United States attorney for the District of Columbia, to the end that [name] may be proceeded against in the manner and form provided by law.

rather than indictment, and therefore would not present the citations to a grand jury. *See* N.Y. Times, Nov. 17, 1960, at 1. On November 25, 1960, the Department announced that it would file an information against only one of the Port Authority officials, Executive Director Austin Tobin, and would not prosecute the remaining two officials. *See* N.Y. Times, Nov. 26, 1960, at 1. The trial began in January 1961 and continued under the supervision of the new Attorney General, Robert F. Kennedy, who never altered the decision not to prosecute the two remaining officials, in spite of a congressional request to do so. Ultimately Tobin's conviction was reversed by the United States Court of Appeals for the District of Columbia Circuit. *Tobin* v. *United States*, 306 F.2d 270 (D.C. Cir.), *cert. denied*, 371 U.S. 902 (1962).[23]

In the foregoing instance, the Department (under two administrations) exercised its prosecutorial discretion not to refer contempt of Congress citations to a grand jury, notwithstanding the seemingly mandatory phrasing of the statute.[24] For the reasons set forth more fully below, we continue to adhere to the conclusion that the Department retains prosecutorial discretion not to refer contempt citations to a grand jury.

### 2. Judicial Opinions Interpreting the Language of § 194

Section 194 imposes similarly worded, nominally mandatory, referral obligations on both the Speaker of the House (or the President of the Senate) and the United States Attorney once a contempt of Congress resolution has been adopted by the House or Senate:

> *it shall be the duty* of the said President of the Senate or the Speaker of the House as the case may be, to certify, *and he shall so certify*, the statement of facts aforesaid under the seal of the Senate or House, as the case may be, to the appropriate United States attorney, *whose duty it shall be* to bring the matter before the grand jury for its action.

(Emphasis added.)

Although the language, "it shall be the duty of" and "whose duty it shall be," might suggest a nondiscretionary obligation, the United States Court of Appeals for the District of Columbia Circuit has expressly held, at least with respect to the Speaker of the House, that the duty is *not* mandatory, and that, in fact, the Speaker has an obligation under the law, at least in some cases, to exercise his discretion in determining whether to refer a contempt citation. *Wilson* v. *United States*, 369 F.2d 198 (D.C. Cir. 1966). In *Wilson*, the court reversed a conviction for contempt of Congress on the ground that the Speaker had assumed that the statute did not permit any exercise of discretion by him

---

[23] The Court of Appeals ruled that the documents requested by the Committee went beyond the investigative authority delegated to the Committee by the House.

[24] We know of at least two other individuals who were cited for contempt of Congress, but whose cases were not referred to a grand jury by the Department of Justice. *See* Department of Justice File No. 51–51–484 (1956). The file was closed because the Department concluded that there was an insufficient basis for prosecution.

120

and he had therefore automatically referred a contempt citation to the United States Attorney while Congress was not in session. The court based its conclusion that the Speaker was required to exercise his discretion on the longstanding practice of both the House and Senate and on congressional debates on contempt citations in which the houses had recognized their own discretion not to approve a contempt resolution. The court concluded that because full House approval of a contempt citation is necessary when Congress was in session, the Speaker is required to exercise some discretion when the House is not in session. 369 F.2d at 203–04.

Although the reasons underlying the court's decision not to impose a mandatory duty on the Speaker in *Wilson* do not necessarily require the same conclusion with respect to the United States Attorney, the decision at least supports the proposition that the seemingly mandatory language of § 194 need not be construed as divesting either the Speaker or the United States Attorney of all discretion.[25]

In several cases, the United States Court of Appeals for the District of Columbia Circuit has at least assumed that the United States Attorney retains discretion not to refer a contempt of Congress citation to a grand jury. In these cases, the court refused to entertain challenges to congressional subpoenas, at least in part on the ground that the prospective witnesses would have adequate subsequent opportunities to challenge a committee's contempt finding, including the opportunity to persuade the United States Attorney not to refer the case to a grand jury. For example, in *Ansara* v. *Eastland*, 442 F.2d 751 (D.C. Cir. 1971), the court declined to entertain a suit to quash a congressional subpoena on the ground that it would be inappropriate, as a matter of the exercise of its equitable power, to interfere with an ongoing congressional process. The court stated that protections were available "within the legislative branch or elsewhere," and then in a footnote indicated that these protections resided "perhaps in the Executive Branch *which may decide not to present the matter to the grand jury* (as occurred in the case of the officials of the New York Port Authority); or perhaps in the Grand Jury which may decide not to return a true bill." 442 F.2d at 754 n.6 (emphasis added).[26] *See also Sanders* v. *McClellan,*

---

[25] In this respect, we believe that *Wilson* implicitly disapproved the *dictum* of *Ex parte Frankfeld*, 32 F. Supp. 915 (D.D.C. 1940), in which the district court stated:

> It seems quite apparent that Congress intended to leave no measure of discretion to either the Speaker of the House or the President of the Senate, under such circumstances, but made the certification of facts to the district attorney a mandatory proceeding, and it left no discretion with the district attorney as to what he should do about it. He is required, under the language of the statute, to submit the facts to the grand jury.

*Id* at 916. The *Frankfeld* court expressly linked the responsibilities of the Speaker and the United States Attorney *Wilson* ruled that the Speaker's duty is discretionary, at least when the House is not in session. Therefore, since the Speaker's duty is *in pari materia* with the duty of the United States Attorney, the law, at least in the District of Columbia Circuit, seems to be that both duties should be viewed as containing some elements of discretion.

[26] *Ansara* v. *Eastland* was cited with approval three times by Judge Smith in *United States* v. *House of Representatives*, 556 F. Supp. 150, 152–53 (D.D.C 1983). Thus, although the opinion made a passing reference to the mandatory nature of referral, Judge Smith must have recognized that the United States Attorney retained prosecutorial discretion.

463 F.2d 894 (D.C. Cir. 1972). In *United States Servicemen's Fund* v. *Eastland*, 488 F.2d 1252 (D.C. Cir. 1973), *rev'd on other grounds*, 421 U.S. 491 (1974), the court agreed to review a challenge to a congressional subpoena brought by a third party, and it distinguished *Ansara* and *McClellan* on the ground that, because the congressional subpoena was issued to a third party, the plaintiffs had no alternative means to vindicate their rights. 488 F.2d at 1260. Among the alternative means the court cited was the right to "seek to convince the executive (the attorney general's representative) not to prosecute." *Id.*

These cases emphasize the particular significance of prosecutorial discretion in the context of the contempt of Congress statute. In general, with respect to any criminal allegation, prosecutorial discretion plays an important role in protecting the rights of the accused by providing an additional level of review with respect to the factual and legal sufficiency of the charges. This role is even more important when dealing with the contempt of Congress statute because, as the above cases demonstrate, witnesses generally have no opportunity to challenge congressional subpoenas directly. Thus, as the cases indicate, prosecutorial discretion serves a vital purpose in protecting the rights of the accused in contempt cases by mitigating the otherwise stern consequences of asserting a right not to respond to a congressional subpoena.

Thus, the practice of the Congress and the available judicial authority support the proposition that the seemingly mandatory duties imposed on congressional officials by 2 U.S.C. § 194 are and were intended to be discretionary. The practice of the Executive Branch and the court decisions reflect a similarly discretionary role under the statute for the United States Attorney. Because, as the balance of this memorandum reveals, these interpretations are consistent with other common-law principles and avoid conclusions that would be at odds with the separation of powers, we believe that a correct reading of 2 U.S.C. § 194 requires recognition of the prosecutor's discretion with respect to referral to a grand jury.

### 3. Common-Law Prosecutorial Discretion

In addition to the court decisions that suggest that the United States Attorney may decide not to refer a contempt citation to a grand jury, the common-law doctrine of prosecutorial discretion weighs heavily against and, in our opinion, precludes an interpretation that the statute requires automatic referral. Because of the wide scope of a prosecutor's discretion in determining which cases to bring, courts, as a matter of law, do not ordinarily interpret a statute to limit that discretion unless the intent to do so is clearly and unequivocally stated. The general rule is that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States* v. *Nixon*, 418 U.S. 683, 693 (1974). *See also Confiscation Cases*, 74 U.S. (7 Wall.) 454 (1869). The Attorney General and his subordinates, including the United States Attorneys, have the authority to exercise this discretion reserved to the Executive. *United States* v. *San Jacinto Tin Co.*, 125 U.S. 273 (1888); *The Gray*

*Jacket*, 72 U.S. (5 Wall.) 370 (1866). In general, courts have agreed with the view of Judge (now Chief Justice) Burger:

> Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought.

*Newman* v. *United States*, 382 F.2d 479, 480 (D.C. Cir. 1967). *See also United States* v. *Batchelder*, 442 U.S. 114 (1979); *Bordenkircher* v. *Hayes*, 434 U.S. 357 (1978).

Courts have applied this general principle of prosecutorial discretion in refusing to interfere with a prosecutor's decision not to initiate a case, despite the specific language of 28 U.S.C. § 547, which states in part that "each United States Attorney, within his district, *shall . . .* prosecute *for all* offenses against the United States." (Emphasis added.) For example, in *Powell* v. *Katzenbach*, 359 F.2d 234 (D.C. Cir. 1965), *cert. denied*, 384 U.S. 906 (1966), the court denied a mandamus petition that sought to force the Attorney General to prosecute a national bank. The court ruled: "It is well settled that the question of whether and when prosecution is to be instituted is within the discretion of the Attorney General. Mandamus will not lie to control the exercise of this discretion." *Id.* at 234. *See also United States* v. *Brown*, 481 F.2d 1035 (8th Cir. 1973); *Bass Anglers Sportsman's Society* v. *Scholze Tannery, Inc.*, 329 F. Supp. 339 (E.D. Tenn. 1971); *Pugach* v. *Klein*, 193 F. Supp. 630 (S.D.N.Y. 1961); *United States* v. *Brokaw*, 60 F. Supp. 100 (S.D. Ill. 1945).

Courts exhibit the same deference to prosecutorial discretion even when the specific statute involved uses words that would otherwise have mandatory, nondiscretionary implications. For example, 42 U.S.C. § 1987 states that United States Attorneys are "authorized *and required* . . . to initiate prosecutions against all persons violating any of the provisions of [the federal criminal civil rights statutes]." (Emphasis added.) Although a number of cases have been initiated to force a United States Attorney to bring civil rights actions on the ground that this statute imposes a nondiscretionary duty to prosecute, *see* Note, *Discretion to Prosecute Federal Civil Rights Crimes*, 74 Yale L.J. 1297 (1965), the courts uniformly have rejected the contention that the statute limits a prosecutor's normal discretion to decide not to bring a particular case. For example, in *Inmates of Attica Correctional Facility* v. *Rockefeller*, 477 F.2d 375 (2d Cir. 1973), the court ruled that the "mandatory nature of the word 'required' as it appears in § 1987 is insufficient to evince a broad Congressional purpose to bar the exercise of executive discretion in the prosecution of federal civil rights crimes." 477 F.2d at 381. The court noted that although similar mandatory language was contained in other statutes, "[s]uch language has never been thought to preclude the exercise of prosecutorial discretion." *Id. Accord Peek* v. *Mitchell*, 419 F.2d 575 (6th Cir. 1970); *Moses* v. *Kennedy*, 219 F. Supp. 762 (D.D.C. 1963), *aff'd sub nom. Moses* v. *Katzenbach*, 342 F.2d 931 (D.C. Cir. 1965). The language employed in 2 U.S.C. § 194 is neither stronger

nor more clearly mandatory than the language of § 1987, which the courts have decided is insufficient to limit the normal prosecutorial discretion.

In fact, there is nothing to distinguish the contempt of Congress statute from any other statute where the prosecutor retains discretion with respect to who shall be prosecuted. Since the early part of the 19th century, it has been recognized that offenses against Congress that are punishable by Congress through its inherent contempt power may also be violations of the criminal laws and, as such, offenses against the United States, with respect to which the normal rules governing criminal prosecutions apply. *See* 2 Op. Att'y Gen. 655 (1834) (concluding that an assault against a congressman could be prosecuted consistent with the Double Jeopardy Clause under the criminal laws, even if the defendant had already been punished by Congress, because the act created two separate offenses, one against Congress and one against the United States). This principle was adopted by the Supreme Court when it upheld the constitutionality of the contempt of Congress statute. *In re Chapman*, 166 U.S. 661 (1897). In *Chapman*, the Court held that the contempt statute did not violate the Double Jeopardy Clause even though a defendant could be punished through Congress' inherent contempt power as well as under the contempt statute. The Court concluded that a refusal to testify involved two separate offenses, one against Congress and one against the United States, and that

> it is quite clear that the contumacious witness is not subjected to jeopardy twice for the same offence, since the same act may be an offence against one jurisdiction and also an offence against another; and indictable statutory offenses may be punished as such, while the offenders may likewise be subjected to punishment for the same acts as contempts, the two being *diverso intuitu* and capable of standing together.

166 U.S. at 672.

The import of the Court's conclusion in this context is clear. Congress' inherent contempt power is the remedy for the offense against Congress, and that remedy remains within Congress' control. The crime of contempt of Congress, like any other federal statutory crime, is an offense against the United States that should be prosecuted as is any other crime. This criminal offense against the United States properly remains subject to the prosecutorial control of the Executive Branch. Therefore, because the contempt statute should be treated as are other federal criminal statutes, we do not believe that § 194 should be read to limit the common law prosecutorial discretion of the United States Attorney. There is nothing in the legislative history of the contempt of Congress statute that is inconsistent with this conclusion. *See* 42 Cong. Globe, 34th Cong., 3d Sess. 4030–44 (1857).

4. Constitutional Considerations

Our construction of § 194 is reinforced by the need to avoid the constitutional problems that would result if § 194 were read to require referral to a

grand jury. As discussed above, the constitutionally prescribed separation of powers requires that the Executive retain discretion with respect to whom it will prosecute for violations of the law. Although most cases expressly avoid this constitutional question by construing statutes not to limit prosecutorial discretion, the cases that do discuss the subject make it clear that common law prosecutorial discretion is strongly reinforced by the constitutional separation of powers. *See, e.g., Inmates of Attica Correctional Facility* v. *Rockefeller*, 477 F.2d 375 (2d Cir. 1973); *Powell* v. *Katzenbach*, 359 F.2d 234 (D.C. Cir. 1965), *cert. denied*, 384 U.S. 906 (1966).

A number of courts have expressly relied upon the constitutional separation of powers in refusing to force a United States Attorney to proceed with a prosecution. For example, in *Pugach* v. *Klein*, 193 F. Supp. 630 (S.D.N.Y. 1961), the court declined to order the United States Attorney to commence a prosecution for violation of federal wiretap laws on the ground that it was

> clear beyond question that it is not the business of the Courts to tell the United States Attorney to perform what they conceive to be his duties.
>
> Article II, § 3 of the Constitution, provides that "[the President] shall take Care that the Laws [shall] be faithfully executed." The prerogative of enforcing the criminal law was vested by the Constitution, therefore, not in the Courts, nor in private citizens, but squarely in the executive arm of the government.

193 F. Supp. at 634. *See also Goldberg* v. *Hoffman*, 225 F.2d 463, 464–65 (7th Cir. 1955).[27]

The Fifth Circuit, sitting en banc, has underscored the constitutional foundations of prosecutorial discretion. *United States* v. *Cox*, 342 F.2d 167 (5th Cir.) (en banc), *cert. denied*, 381 U.S. 935 (1965). In *Cox*, the court overturned a district court's order that a United States Attorney prepare and sign an indictment that a grand jury had voted to return. The plurality opinion stated:

> The executive power is vested in the President of the United States, who is required to take care that the laws be faithfully executed. The Attorney General is the hand of the President in taking care that the laws of the United States in legal proceed-

---

[27] These conclusions are not inconsistent with Rule 48(a) of the Federal Rules of Criminal Procedure, which requires leave of court before dismissal of a criminal action. This provision is intended primarily to protect defendants against repeated prosecutions for the same offense, and a court's power to deny leave under this provision is extremely limited. *See Rinaldi* v. *United States*, 434 U.S. 22 (1977); *United States* v. *Hamm*, 659 F.2d 624 (5th Cir. 1981); *United States* v. *Ammidown*, 497 F.2d 615 (D.C. Cir. 1973). The United States Court of Appeals for the Fifth Circuit has stated that the constitutionality of Rule 48(a) is dependent upon the prosecutor's unfettered ability to decide not to commence a case in the first place. *United States* v. *Cox*, 342 F.2d 167 (5th Cir.) (en banc), *cert. denied*, 381 U.S. 935 (1965). Moreover, Judge Weinfeld has stated that even if a court denied leave to dismiss an indictment, a court "in that circumstance would be without power to issue a mandamus or other order to compel prosecution of the indictment, since such a direction would invade the traditional separation of powers doctrine." *United States* v. *Greater Blouse, Skirt & Neckwear Contractors Ass'n*, 228 F. Supp. 483 (S.D.N.Y. 1964).

ings and in the prosecution of offenses, be faithfully executed. The role of the grand jury is restricted to a finding as to whether or not there is probable cause to believe that an offense has been committed. The discretionary power of the attorney for the United States in determining whether a prosecution shall be commenced or maintained may well depend upon matters of policy wholly apart from any question of probable cause. Although as a member of the bar, the attorney for the United States is an officer of the court, he is nevertheless an executive official of the Government, and it is as an officer of the executive department that he exercises a discretion as to whether or not there shall be a prosecution in a particular case. It follows, as an incident of the constitutional separation of powers, that courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions.

342 F.2d at 171 (footnotes omitted). *See also id.* at 182–83 (Brown, J. concurring); *id.* at 190–93 (Wisdom, J., concurring). Even the three dissenting judges in *Cox* conceded that, although they believed that the United States Attorney could be required to sign the indictment, "once the indictment is returned, the Attorney General or the United States Attorney can refuse to go forward." *Id.* at 179. *See United States* v. *Nixon*, 418 U.S. 683, 693 (1974) ("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case") (citing, *inter alia, Cox*).

Although prosecutorial discretion may be regulated to a certain extent by Congress and in some instances by the Constitution, the decision not to prosecute an individual may not be controlled because it is fundamental to the Executive's prerogative. For example, the individual prosecutorial decision is distinguishable from instances in which courts have reviewed the legality of general Executive Branch policies. *See Nader* v. *Saxbe*, 497 F.2d 676 (D.C. Cir. 1974); *Adams* v. *Richardson*, 480 F.2d 1159 (D.C. Cir. 1973) (en banc) (per curiam); *NAACP* v. *Levi*, 418 F. Supp. 1109 (D.D.C. 1976). In these cases the courts accepted jurisdiction to rule whether an entire enforcement program was being implemented based on an improper reading of the law. The cases expressly recognize, however, both that a decision to prosecute in an individual case involves many factors other than merely probable cause, and that "the balancing of these permissible factors in individual cases is an executive, rather than a judicial function which follows from the need to keep the courts as neutral arbiters in the criminal law generally . . . and from Art. II, § 3 of the Constitution, which charges the President to 'take Care that the Laws be faithfully executed.'" *Nader* v. *Saxbe*, 497 F.2d at 679 n.18. Similarly distinguishable are the cases concerning the constitutional limits on selective prosecution, which hold that prosecutorial discretion may not be exercised on the basis of impermissible factors such as race, religion, or the exercise of free

126

speech. *See, e.g., Marshall* v. *Jerrico, Inc.*, 446 U.S. 238, 249 (1980); *Oyler* v. *Boles*, 368 U.S. 448 (1962).

If the congressional contempt statute were interpreted to divest the United States Attorney of discretion, then the statute would create two distinct problems with respect to the separation of powers. "The doctrine of separated powers is implemented by a number of constitutional provisions, some of which entrust certain jobs exclusively to certain branches while others say that a given task is *not* to be performed by a given branch." *United States* v. *Brown*, 381 U.S. 437, 443 (1965). Divesting the United States Attorney of discretion would run afoul of both aspects of the separation of powers by stripping the Executive of its proper constitutional authority and by vesting improper power in Congress.

First, as the cases cited above demonstrate, Congress may not deprive the Executive of its prosecutorial discretion. In areas where the President has specific executive authority, Congress may establish standards for the exercise of that authority, but it may not remove all Presidential authority. For example, Congress may require the President to make appointments to certain executive positions and may define the qualifications for those positions, but it may not select the particular individuals whom the President must appoint to those positions. *See Buckley* v. *Valeo*, 424 U.S. 1 (1976). Similarly, Congress may adopt the criminal provisions for which individuals may be prosecuted and impose certain qualifications on how the Executive should select individuals for prosecution, but it may not identify the particular individuals who must be prosecuted. The courts have declared that the ultimate decision with respect to prosecution of individuals must remain an executive function under the Constitution.

Second, if Congress could specify an individual to be prosecuted, it would be exercising powers that the Framers intended not be vested in the legislature. A legislative effort to require prosecution of a specific individual has many of the attributes of a bill of attainder and would seem to be inconsistent with many of the policies upon which the Constitution's prohibition against bills of attainder was based. *See United States* v. *Brown*, 381 U.S. 437 (1965); *United States* v. *Lovett*, 328 U.S. 303 (1946). The constitutional role of Congress is to adopt general legislation that will be applied and implemented by the Executive Branch. "It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments." *Fletcher* v. *Peck*, 10 U.S. (6 Cranch) 87, 136 (1810); *see United States* v. *Brown*, 381 U.S. 437, 446 (1965). The Framers intended that Congress not be involved in such prosecutorial decisions or in questions regarding the criminal liability of specific individuals. As the Supreme Court stated in *Lovett*:

> Those who wrote our Constitution well knew the danger inherent in special legislative acts which take away the life, liberty, or property of particular named persons, because the legislature thinks them guilty of conduct which deserves punishment.

127

328 U.S. at 317. Justice Powell has echoed this concern: "The Framers were well acquainted with the danger of subjecting the determination of the rights of one person to the 'tyranny of shifting majorities.'" *INS* v. *Chadha*, 462 U.S. 917, 961 (1983) (Powell, J. concurring). As we have shown above, courts may not require prosecution of specific individuals, even though the Judicial Branch is expressly assigned the role of adjudicating individual guilt. *A fortiori*, the Legislative Branch, which is assigned the role of passing laws of general applicability and specifically excluded from questions of individual guilt or innocence, may not decide on an individual basis who will be prosecuted.

These constitutional principles of prosecutorial discretion apply even though the issue here is referral to the grand jury and not commencement of a criminal case after indictment. A referral to a grand jury commences the criminal prosecution process. That step is as much a part of the function of executing the laws as is the decision to sign an indictment. The cases expressly recognize that prosecutorial discretion applies at any stage of the investigative process, even to the decision whether to begin an investigation at all. *See Inmates of Attica Correctional Facility* v. *Rockefeller*, 477 F.2d 375 (2d Cir. 1973); *Smith* v. *United States*, 375 F.2d 243, 248 (5th Cir.), *cert. denied*, 389 U.S. 841 (1967). In the latter case, the court emphasized that prosecutorial discretion was protected "no matter whether these decisions are made during the investigation or prosecution of offenses." 375 F.2d at 248. Moreover, if the Executive has already determined that, as a matter of law, no violation of the law has occurred, it would serve no practical purpose to refer a case to the grand jury. Given the importance of these constitutional principles and the fundamental need to preserve the Executive's power to enforce the laws, we see no reason for distinguishing between the decision to prosecute and the decision to refer to the grand jury in this case.[28]

For all of the above reasons, as a matter of statutory construction strongly reinforced by constitutional separation of powers principles, we believe that the United States Attorney and the Attorney General, to whom the United States Attorney is responsible, retain their discretion not to refer a contempt of Congress citation to a grand jury. It follows, of course, that we believe that even if the provision of a statute requiring reference to a grand jury were to be upheld, the balance of the prosecutorial process could not be mandated.

---

[28] A statute giving one house of Congress the power to *direct* an Executive Branch official to take any particular action also raises a separate issue under the Supreme Court's decision in *INS* v. *Chadha*, 462 U.S. 917 (1983). Under the current contempt statute, the role of the House or Senate in simply referring a matter to the United States Attorney for possible prosecution raises no substantial issue under *Chadha* because the House or Senate is acting, in a sense, as a private citizen would — by reporting a possible violation of federal criminal law. Thus, *Chadha's* proscription of actions by one house (or two houses or a congressional committee) that are designed to have "the purpose and effect of altering the legal rights, duties, and relations of persons . . . outside the Legislative Branch" would be inapplicable. *Id* at 952. If the contempt statute precluded prosecutorial discretion, however, one house would be empowered to impose on the United States Attorney an affirmative legal duty to initiate a prosecution and to take certain steps in that prosecution. To empower one house of Congress in that manner would appear to be contrary to the clear language and rationale of *Chadha*. This is not, of course, to say that Congress' attempt to impose such an obligation on the United States Attorney by plenary legislation in a specific case would be constitutional; it is to say that a permanent mechanism to be triggered by the vote of one house raises a significant additional constitutional concern.

## B. Whether the Criminal Contempt of Congress Statute Applies to an Executive Official Who Asserts, On Direct Orders of the President, the President's Claim of Executive Privilege

We next consider, aside from the issue of prosecutorial discretion, whether the criminal contempt of Congress statute is intended to apply, or constitutionally could be applied, to Presidential claims of executive privilege.

### 1. Previous Department of Justice Interpretations of the Contempt of Congress Statute

The Department of Justice has previously taken the position that the criminal contempt of Congress statute does not apply to executive officials who assert claims of executive privilege at the direction of the President. In 1956, Deputy Attorney General (subsequently Attorney General) William P. Rogers took this position before a congressional subcommittee investigating the availability of information from federal departments and agencies. In a lengthy memorandum of law, Deputy Attorney General Rogers set forth the historical basis of executive privilege and concluded that in the context of Presidential assertions of the privilege, the contempt of Congress statute was "inapplicable to the executive departments." *See Hearings Before a Subcommittee of the House Committee on Government Operations*, 84th Cong., 2d Sess. 2933 (1956).[29] We are not aware of any subsequent Department position that reverses or weakens this conclusion, and we have found no earlier Department position to the contrary.

We believe that the Department's long-standing position that the contempt of Congress statute does not apply to executive officials who assert Presidential claims of executive privilege is sound, and we concur with it. Our conclusion is based upon the following factors: (1) the legislative history of the contempt of Congress statute demonstrates that it was not intended to apply to Presidential assertions of executive privilege; and (2) if the statute were construed to apply to Presidential assertions of executive privilege, it would so inhibit the President's ability to make such claims as to violate the separation of powers.

### 2. The Legislative History of the Contempt of Congress Statute

Neither the legislative history nor the historical implementation of the contempt statute supports the proposition that Congress intended the statute to apply to executive officials who carry out a Presidential assertion of executive privilege. The criminal contempt statute was originally enacted in 1857 during proceedings in the House of Representatives to consider a contempt of Congress citation against a New York Times correspondent who had refused to

---

[29] The memorandum cited, *inter alia*, a 1909 Senate debate over the issue of executive privilege in which Senator Dolliver questioned "where Congress gets authority either out of the Constitution or the laws of the United States to order an executive department about like a servant." 43 Cong. Rec. 3732 (1909) Other historical examples cited by the report are discussed below.

answer questions put to him by a select committee appointed by the House to investigate charges of bribery of certain Representatives. As a result of the committee's unavailing efforts to obtain the reporter's testimony, the committee chairman introduced a bill designed "more effectually to enforce the attendance of witnesses on the summons of either House of Congress, and to compel them to deliver testimony." 42 Cong. Globe 404 (1857). The bill was supported as a necessary tool in the House's efforts to investigate the allegations of bribery. *See id.* at 405 (remarks of the Speaker), 426 (remarks of Sen. Toombs), 427 (remarks of Rep. Davis), 445 (remarks of Sen. Brown). The bill was rushed through Congress in less than a week in order to permit the House to bring greater pressure on the reporter to reveal the alleged source of the congressional corruption. That the bill was sponsored by the select committee, and not the Judiciary Committee, further demonstrates that the bill was not the result of a general consideration of Congress' contempt power, but was enacted as an expedient to aid a specific investigation. Thus, the circumstances of the bill's passage certainly do not affirmatively suggest that Congress anticipated application of the statute to instances in which the President asserted a claim of executive privilege.

In fact, the sponsor of the bill disclaimed any such far-reaching implications. Representative Dunn asked the sponsor, Representative Orr, what impact the proposed bill would have on diplomatic secrets, one of the principal areas in which the President had historically asserted a privilege of confidentiality. Representative Dunn stated that use of the contempt statute by Congress to force disclosure of such material "might be productive of great mischief, and in time of war of absolute ruin of the country." 42 Cong. Globe 431 (remarks of Rep. Dunn). Representative Orr replied, "I can hardly conceive such a case" and emphasized that the bill should not be attacked "by putting instances of the extremest cases" because the "object which this committee had in view was, where there was corruption in either House of Congress, to reach it." *Id.* at 431 (remarks of Rep. Orr). The implication is that Congress did not intend the bill to apply to Presidential assertions of privilege.[30]

---

[30] The legislative history contains one reference to the application of the statute against executive officials. During the floor debates, Representative Marshall attacked the bill by claiming that it "proposes to punish equally the Cabinet officer and the culprit who may have insulted the dignity of this House by an attempt to corrupt a Representative of the people." 42 Cong. Globe at 429. This statement does not, however, suggest that the statute was intended to apply to Presidential assertions of executive privilege. Indeed, virtually all previous assertions of executive privilege against Congress had been made by the President himself, and Congress expressed no intent to utilize the criminal contempt provisions against the President. Representative Marshall's statement, therefore, simply lends support to the proposition, with which we agree, that there are certain circumstances in which the congressional contempt statute might be utilized against an executive official, such as instances in which an executive official, acting on his own, engaged in disruptive and contumacious conduct during a congressional hearing, or in which an executive official, acting on his own, committed an offense. *See Marshall* v. *Gordon*, 243 U.S. 521 (1917). As the remainder of Representative Marshall's remarks demonstrate, the principal force driving the bill was Congress' desire to obtain an expeditious method for investigating questions regarding the integrity of Congress and not to provide Congress with a statute requiring the President to prosecute criminally those who had asserted the President's constitutionally based claim of executive privilege. We have found no evidence in the legislative history that supports an intention to apply the proposed statute in such a context.

In the years preceding the adoption of the statute, the President had, on a number of occasions, withheld documents from Congress under a claim of executive privilege, and many of these instances had been hotly contested in the public arena, and at least five of these instances occurred within the decade immediately preceding the enactment of the congressional contempt statute. *See supra* note 19 (collecting authorities). In spite of these highly visible battles over the subject of executive privilege, we have located no indication in the legislative history of the criminal contempt statute that Congress intended the statute to provide a remedy for refusals to produce documents pursuant to a Presidential claim of executive privilege.

The natural inference to be drawn from this vacuum in the legislative history is reinforced by Congress' failure, as far as we know, *ever* to utilize its inherent power of arrest to imprison Executive Branch officials for contempt of Congress for asserting claims of executive privilege, even though Congress had previously asserted and exercised its clearly recognized right to do so with respect to other instances of contempt by private citizens. *See Anderson* v. *Dunn*, 19 U.S. (6 Wheat.) 204 (1821); *Ex Parte Nugent*, 18 F. Cas. 471 (C.C.D.C. 1848). The absence of any congressional discussion of the use of the contempt power against Presidential claims of executive privilege and Congress' previous failure ever to attempt to use its inherent contempt power in such cases, strongly suggest that the statute was not intended to apply to such assertions.

This conclusion is supported by the subsequent history of the congressional contempt statute. Since enactment of the statute in 1857, there have been numerous instances in which the President has withheld documents from Congress under a claim of executive privilege. Despite the fact that many of these disputes were extraordinarily controversial, until the citation of the EPA Administrator in December 1982, 125 years after the contempt statute was enacted, neither house of Congress had ever voted to utilize the contempt statute against a Presidential assertion of executive privilege. In fact, during congressional debates over Presidential refusals to produce documents to Congress, there have been express acknowledgements by members of Congress that Congress had no recourse against the Executive if the President asserted executive privilege. In 1886, the Senate engaged in a prolonged debate over President Cleveland's order to his Attorney General not to produce to Congress documents concerning the dismissal of a United States Attorney. The debate was intense, controversial, and memorable; 23 years after the debate a Senator termed it the "most remarkable discussion which was ever had upon this question [of the President's right to withhold documents from Congress]." 43 Cong. Rec. 841 (1909) (remarks of Sen. Bacon). During this debate, even Senators who insisted upon the Senate's right to receive the documents recognized that if the President ordered them not to be produced, "there is no remedy." 17 Cong. Rec. 2800 (1886) (remarks of Sen. Logan); *see also id.* at 2737 (1886) (remarks of Sen. Voorhees).[31]

---

[31] The only remedy then recognized by the Senators was the ultimate sanction of impeachment. *See* 17
Continued

131

Congress' failure to resort to the contempt statute during any of the multitude of robust conflicts over executive privilege during the previous century and one quarter and Congress' own explicit recognition that it was without a remedy should the President order the withholding of documents, strongly suggest that Congress never understood the statute to apply to an executive official who asserted the President's claim of executive privilege.[32]

### 3. Prudential Reasons for Construing the Contempt Statute Not To Apply to Presidential Assertions of Privilege

Courts traditionally construe statutes in order to avoid serious doubts about a statute's constitutionality. *Califano* v. *Yamasaki*, 442 U.S. 682, 693 (1979); *Crowell* v. *Benson*, 285 U.S. 22, 62 (1932). As stated by the United States Court of Appeals for the District of Columbia Circuit, "when one interpretation of a statute would create a substantial doubt as to the statute's constitutional validity, the courts will avoid that interpretation absent a 'clear statement' of contrary legislative intent." *United States* v. *Brown*, 483 F.2d 1314, 1317 (D.C. Cir. 1973) (quoting *United States* v. *Thompson*, 452 F.2d 1333, 1337 (D.C. Cir. 1971), *cert. denied*, 405 U.S. 998 (1972)).

When a possible conflict with the President's constitutional prerogatives is involved, the courts are even more careful to construe statutes to avoid a constitutional confrontation. A highly significant example may be found in the procedural history and holding of *United States* v. *Nixon*, 418 U.S. 683 (1974), in which the Court construed the limitation in 28 U.S.C. § 1291 (that appeals be taken only from "final" decisions of a district court) in order to permit the President to appeal an adverse ruling on his claim of executive privilege without having to place himself in contempt of court. Although the plain language of that statute seemed to preclude an appeal of a lower court's

---

[31] (. . . continued)

Cong. Rec. 2737, 2800 (1886). As we note below, a much more effective and less controversial remedy is available — a civil suit to enforce the subpoena — which would permit Congress to acquire the disputed records by judicial order. *See also Senate Select Committee on Presidential Campaign Practices v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc).

[32] Congress' practices with respect to the contempt statute and the absence of any previous application of the statute to an Executive Branch official in these circumstances are highly probative of the meaning and applicability of the statute. In general, the Supreme Court has examined historical practice to determine the scope of Congress' powers. For example, in determining the scope of Congress' power to call and examine witnesses, the Court looked to the historical experience with respect to investigations and concluded:

> when [Congress'] practice in the matter is appraised according to the circumstances in which it was begun and to those in which it has been continued, it falls nothing short of a practical construction, long continued, of the constitutional provisions respecting their powers; and therefore should be taken as fixing the meaning of those provisions, if otherwise doubtful.

*McGrain* v. *Daugherty*, 273 U.S. 135, 174 (1927); *see also Fairbank* v. *United States*, 181 U.S. 283, 308 (1901). Moreover, the Court traditionally gives great weight to a contemporaneous construction of a statute by the agency charged with its execution. *See Power Reactor Development Co.* v. *Electricians*, 367 U.S. 396, 408 (1961); *Unemployment Compensation Comm'n* v. *Aragon*, 329 U S. 143, 153 (1946). In this instance, Congress is responsible for taking the first step in implementing the contempt statute. Therefore, Congress' previous interpretations and past uses of the statute are analogous to the contemporaneous construction of the agency charged with implementation of the statute, and are of significance in determining the meaning of the statute.

132

interlocutory ruling on an evidentiary matter, the Court construed the statute to permit an immediate appeal, without going through the otherwise required contempt proceeding:

> The traditional contempt avenue to immediate appeal is peculiarly inappropriate due to the unique setting in which the question arises. To require a President of the United States to place himself in the posture of disobeying an order of a court merely to trigger the procedural mechanism of the ruling would be unseemly, and would present an unnecessary occasion for constitutional confrontation between two branches of the government.

418 U.S. at 691–92.

Congress itself has previously recognized the impropriety of resolving executive privilege disputes in the context of criminal contempt proceedings. During the dispute over the Watergate tapes, Congress provided a civil enforcement mechanism through which to test the President's claim of executive privilege. Senator Ervin, the sponsor of the bill, noted in his explanatory statement to the Senate that the use of criminal contempt "may be inappropriate, unseemly, or nonefficacious where executive officers are involved." 119 Cong. Rec. 35715 (1973). In defending the civil enforcement procedure before the district court, Congress argued that in that case the contempt procedures would be "inappropriate methods for the presentation and resolution of the executive privilege issue," and that a criminal proceeding would be "a manifestly awkward vehicle for determining the serious constitutional question here presented." Plaintiff's Memorandum of Points and Authorities in Support of Motion for Summary Judgment, *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, Civ. No. 1593–73, at 5 (D.D.C. Aug. 28, 1973).

The United States Court of Appeals for the District of Columbia Circuit has stated on several occasions that criminal contempt proceedings are an inappropriate means for resolving document disputes, especially when they involve another governmental entity. In *Tobin* v. *United States*, 306 F.2d 270 (D.C. Cir.), *cert. denied*, 371 U.S. 902 (1962), the court reversed a contempt of Congress conviction on the ground that the congressional subpoena had gone beyond the investigative authority delegated to the committee that issued the subpoena. After deciding this issue, however, the court felt "inclined to add a few words in conclusion" concerning the problems involved in a criminal contempt of Congress case against a public official. In *dictum*, the court noted that the "conflicting duality inherent in a request of this nature is not particularly conducive to the giving of any satisfactory answer, no matter what the answer should prove to be," and it cited the "eloquent plea" of District Judge Youngdahl in the case below, which read in part:

> Especially where the contest is between different governmental units, the representative of one unit in conflict with another should not have to risk jail to vindicate his constituency's rights.

> Moreover, to raise these issues in the context of a contempt case is to force the courts to decide many questions that are not really relevant to the underlying problem of accommodating the interest of two sovereigns.

306 F.2d at 276. *See also United States* v. *Fort*, 443 F.2d 670, 677–78 (D.C. Cir. 1970), *cert. denied*, 403 U.S. 932 (1971).

The analysis contained in *United States* v. *Nixon* demonstrates that principles of the separation of powers compel the application of special rules when a Presidential claim of a constitutional privilege is in tension with the request of another branch for confidential Executive Branch records. In discussing the issue of executive privilege in that case in response to a judicial subpoena, the Court stressed that the President's assertion of privilege was not to be treated as would a claim of a statutory or common law privilege by a private citizen. 418 U.S. at 708, 715. The President's constitutional role as head of one of three separate branches of government means that special care must be taken to construe statutes so as not to conflict with his ability to carry out his constitutional responsibilities. *See, e.g., Myers* v. *United States*, 272 U.S. 52 (1926) (upholding the President's removal power against limitations Congress sought to impose). The same special attention is provided, of course, to the other two branches when they assert responsibilities or prerogatives peculiar to their constitutional duties. *See, e.g., Gravel* v. *United States*, 408 U.S. 606 (1972) (extending immunity of Speech and Debate Clause to congressional assistants); *Pierson* v. *Ray*, 386 U.S. 547 (1967) (granting absolute civil immunity for judges' official actions).

In this case, the congressional contempt statute must be interpreted in light of the specific constitutional problems that would be created if the statute were interpreted to reach an Executive Branch official such as the EPA Administrator in the context considered here.[33] As explained more fully below, if executive officials were subject to prosecution for criminal contempt whenever they carried out the President's claim of executive privilege, it would significantly burden and immeasurably impair the President's ability to fulfill his constitutional duties. Therefore, the separation of powers principles that underlie the doctrine of executive privilege also would preclude an application of the contempt of Congress statute to punish officials for aiding the President in asserting his constitutional privilege.[34]

---

[33] The same principle applies to protect the constitutional functions of the other branches. The separation of powers would similarly seem to require that a statute that made it a crime to disregard a statute passed by Congress be read not to apply to a judge who struck down a congressional enactment as unconstitutional.

[34] In addition to the encroachment on the constitutionally required separation of powers that prosecution of an Executive Branch official in this context would entail, there could be a serious due process problem if such an official were subjected to criminal penalties for obeying an express Presidential order, an order which was accompanied by advice from the Attorney General that compliance with the Presidential directive was not only consistent with the constitutional duties of the Executive Branch, but also affirmatively necessary in order to aid the President in the performance of his constitutional obligations to take care that the law was faithfully executed. *See Cox* v. *Louisiana*, 379 U.S. 559 (1965); *Raley* v. *Ohio*, 360 U.S. 423 (1959).

Continued

134

4. The Constitutional Implications of Application of the Contempt of Congress Statute to Executive Branch Officials Who Assert the President's Claim of Privilege

The Supreme Court has stated that, in determining whether a particular statute

> disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions. *United States* v. *Nixon*, 418 U.S. at 711–712. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress.

*Nixon* v. *Administrator of General Services*, 433 U.S. 425, 443 (1977). Thus, in analyzing this separation of powers issue, one must look first to the impact that application of the congressional contempt statute to Presidential assertions of executive privilege would have on the President's ability to carry out his constitutionally assigned functions. Then, if there is a potential for disruption, it is necessary to determine whether Congress' need to impose criminal contempt sanctions in executive privilege disputes is strong enough to outweigh the impact on the Executive's constitutional role.

In this instance, at stake is the President's constitutional responsibility to enforce the laws of the United States and the necessarily included ability to protect the confidentiality of information vital to the performance of that task. As explained earlier in this memorandum, the authority to maintain the integrity of certain information within the Executive Branch has been considered by virtually every President to be essential to his capacity to fulfill the responsibilities assigned to him by the Constitution. Thus, as discussed above, and as the Supreme Court has recognized, the capacity to protect the confidentiality of some information is integral to the constitutional role of the President.

For these reasons, the Supreme Court has ruled that the President's assertion of executive privilege is *presumptively valid* and can be overcome only by a clear showing that another branch cannot responsibly carry out its assigned constitutional function without the privileged information. *United States* v. *Nixon*, 418 U.S. at 708. In *Nixon*, the Court stated that "upon receiving a claim

---

[34] (. . . continued)

Furthermore, a person can be prosecuted under § 192 only for a "willful" failure to produce documents in response to a congressional subpoena. *See United States* v. *Murdock*, 290 U.S. 389, 397–98 (1933); *Townsend* v. *United States*, 95 F.2d 352, 359 (D.C. Cir.), *cert. denied*, 303 U.S. 664 (1938). There is some doubt whether obeying the President's direct order to assert his constitutional claim of executive privilege would amount to a "willful" violation of the statute. Moreover, reliance on an explicit opinion of the Attorney General may negate the required *mens rea* even in the case of a statute without a willfulness requirement. *See* Model Penal Code § 2.04(3)(b); *United States* v. *Barker*, 546 F.2d 940, 955 (D.C. Cir. 1976) (Mehrige J., concurring).

of privilege from the Chief Executive, it became the further duty of the District Court to treat the subpoenaed material as presumptively privileged." 418 U.S. at 713. The United States Court of Appeals for the District of Columbia Circuit has stated that this presumptive privilege initially protects documents "even from the limited intrusion represented by *in camera* examination of the conversations by a court." *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725, 730 (D.C. Cir. 1974) (en banc). The court went on to note:

> So long as the presumption that the public interest favors confidentiality can be defeated only by a strong showing of need by another institution of government a showing that the responsibilities of that institution cannot responsibly be fulfilled without access to records of the President's deliberations we believed in Nixon v. Sirica, and continue to believe, that the effective functioning of the presidential office will not be impaired.

*Id.* at 730. In order to overcome the presumptively privileged nature of the documents, a congressional committee must show that "the subpoenaed evidence is *demonstrably critical* to the responsible fulfillment of the Committee's functions." *Id.* at 731 (emphasis added). Thus, the President's assertion of executive privilege is far different from a private person's individual assertion of privilege; it is entitled to special deference due to the critical connection between the privilege and the President's ability to carry out his constitutional duties.

Application of the criminal contempt statute to Presidential assertions of executive privilege would immeasurably burden the President's ability to assert the privilege and to carry out his constitutional functions. If the statute were construed to apply to Presidential assertions of privilege, the President would be in the untenable position of having to place a subordinate at the risk of a criminal conviction and possible jail sentence in order for the President to exercise a responsibility that he found necessary to the performance of his constitutional duty. Even if the privilege were upheld, the executive official would be put to the risk and burden of a criminal trial in order to vindicate the President's assertion of his constitutional privilege. As Judge Learned Hand stated with respect to the policy justifications for a prosecutor's immunity from civil liability for official actions,

> to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to [sic] satisfy a jury of his good faith.

*Gregoire* v. *Biddle*, 177 F.2d 579, 581 (2d Cir. 1949), *cert. denied*, 339 U.S. 949 (1950). The Supreme Court has noted, with respect to the similar issue of

executive immunity from civil suits, that "among the most persuasive reasons supporting official immunity is the prospect that damages liability may render an official unduly cautious in the discharge of his official duties." *Nixon* v. *Fitzgerald*, 457 U.S. 731, 752 n.32 (1982); *see also Harlow* v. *Fitzgerald*, 457 U.S. 800 (1982); *Butz* v. *Economou*, 438 U.S. 478 (1978). Thus, the courts have recognized that the risk of civil liability places a pronounced burden on the ability of government officials to accomplish their assigned duties, and have restricted such liability in a variety of contexts. *Id.*[35] The even greater threat of criminal liability, simply for obeying a Presidential command to assert the President's constitutionally based and presumptively valid privilege against disclosures that would impair his ability to enforce the law, would unquestionably create a significant obstacle to the assertion of that privilege. *See United States* v. *Nixon*, 418 U.S. 683 (1974).

By contrast, the congressional interest in applying the criminal contempt sanctions to a Presidential assertion of executive privilege is comparatively slight. Although Congress has a legitimate and powerful interest in obtaining any unprivileged documents necessary to assist it in its lawmaking function, Congress could obtain a judicial resolution of the underlying privilege claim and vindicate its asserted right to obtain any documents by a civil action for enforcement of a congressional subpoena.[36] Congress' use of civil enforcement power instead of the criminal contempt statute would not adversely affect Congress' ultimate interest in obtaining the documents. Indeed, a conviction of an Executive Branch official for contempt of Congress for failing to produce subpoenaed documents would not result in any order for the production of the documents.[37] A civil suit to enforce the subpoena would be aimed at the congressional objective of obtaining the documents, not at inflicting punishment on an individual who failed to produce them. Thus, even if criminal sanctions were not available against an executive official who asserted the President's claim of privilege, Congress would be able to vindicate a legitimate desire to obtain documents if it could establish that its need for the records outweighed the Executive's interest in preserving confidentiality.

The most potent effect of the potential application of criminal sanctions would be to deter the President from asserting executive privilege and to make it difficult for him to enlist the aid of his subordinates in the process. Although

---

[35] *See also Barr* v. *Matteo*, 360 U.S. 564 (1959), *Spalding* v. *Vilas*, 161 U.S. 483 (1896) Some officials, such as judges and prosecutors, have been given absolute immunity from civil suits arising out of their official acts. *Imbler* v. *Pachtman*, 424 U.S. 409 (1976), *Pierson* v. *Ray*, 386 U.S. 547 (1967).

[36] It is arguable that Congress already has the power to apply for such civil enforcement, since 28 U.S C. § 1331 has been amended to eliminate the amount in controversy requirement, which was the only obstacle cited to foreclose jurisdiction under § 1331 in a previous civil enforcement action brought by the Senate. *See Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 366 F. Supp. 51 (D.D.C. 1973). In any event, there is little doubt that, at the very least, Congress may authorize civil enforcement of its subpoenas and grant jurisdiction to the courts to entertain such cases. *See Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725 (D.C Cir. 1974) (en banc); Hamilton and Grabow, *A Legislative Proposal for Resolving Executive Privilege Disputes Precipitated by Congressional Subpoenas*, 21 Harv. J on Legis. 145 (1984).

[37] *See* Hamilton and Grabow, *supra*, 21 Harv J. on Legis. at 151.

this significant *in terrorem* effect would surely reduce claims of executive privilege and, from Congress' perspective, would have the salutary impact of virtually eliminating the obstacles to the obtaining of records, it would be inconsistent with the constitutional principles that underlie executive privilege to impose a criminal prosecution and criminal penalties on the President's exercise of a presumptively valid constitutional responsibility. The *in terrorem* effect may be adequate justification for Congress' use of criminal contempt against private individuals, but it is an inappropriate basis in the context of the President's exercise of his constitutional duties. In this respect it is important to recall the statement of Chief Justice Marshall, sitting as a trial judge in the *Burr* case, concerning the ability of a court to demand documents from a President: "In no case of this kind would a court be required to proceed against the President as against an ordinary individual." *United States* v. *Burr*, 25 F. Cas. 187, 192 (C.C. Va. 1807).[38] This fundamental principle, arising from the constitutionally prescribed separation of powers, precludes Congress' use against the Executive of coercive measures that might be permissible with respect to private citizens. The Supreme Court has stated that the fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question. So much is implied in the very fact of the separation of the powers of these departments by the Constitution; and in the rule which recognizes their essential equality. *Humphrey's Executor* v. *United States*, 295 U.S. 602, 629–30 (1935).

Congress' use of the coercive power of criminal contempt to prevent Presidential assertions of executive privilege is especially inappropriate given the presumptive nature of the privilege. In cases involving congressional subpoenas against private individuals, courts start with the presumption that Congress has a right to all testimony that is within the scope of a proper legislative inquiry. *See Barenblatt* v. *United States*, 360 U.S. 109 (1959); *McGrain* v. *Daugherty*, 273 U.S. 135 (1927). As noted above, however, the President's assertion of executive privilege is presumptively valid, and that presumption may be overcome only if Congress establishes that the requested information "is demonstrably critical to the responsible fulfillment of the Committee's functions." *See Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d at 731; *see also United States* v. *Nixon*, 418 U.S. at 708–09. If Congress could use the power of criminal contempt to coerce the President either not to assert or to abandon his right to assert executive privilege, this clearly established presumption would be reversed and the presumptive privilege nullified.

Congress has many weapons at its disposal in the political arena, where it has clear constitutional authority to act and where the President has corresponding political weapons with which to do battle against Congress on equal terms. By wielding the cudgel of criminal contempt, however, Congress seeks to invoke

---

[38] The *Nixon* Court thought this statement significant enough in the context of an executive privilege dispute to quote it in full at two separate places in its decision *United States* v. *Nixon*, 418 U.S. at 708, 715.

the power of the third branch, not to resolve a dispute between the Executive and Legislative Branches and to obtain the documents it claims it needs, but to punish the Executive, indeed to punish the official who carried out the President's constitutionally authorized commands,[39] for asserting a constitutional privilege. That effort is inconsistent with the "spirit of dynamic compromise" that requires accommodation of the interests of both branches in disputes over executive privilege. *See United States* v. *American Telephone & Telegraph Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). In the AT&T case, the court insisted on further efforts by the two branches to reach a compromise arrangement on an executive privilege dispute and emphasized that

> the resolution of conflict between the coordinate branches in these situations must be regarded as an opportunity for a constructive *modus vivendi*, which positively promotes the functioning of our system. The Constitution contemplates such accommodation. Negotiation between the two branches should thus be viewed as a dynamic process affirmatively furthering the constitutional scheme.

*Id.* at 130. Congress' use of the threat of criminal penalties against an executive official who asserts the President's claim of executive privilege, flatly contradicts this fundamental principle.[40]

The balancing required by the separation of powers demonstrates that the contempt of Congress statute cannot be constitutionally applied to an executive official in the context under consideration. On the one hand, Congress has no

---

[39] One scholar (former Assistant Attorney General for the Civil Division, and now Solicitor General, Rex Lee) has noted that

> when the only alleged criminal conduct of the putative defendant consists of obedience to an assertion of executive privilege by the President from whom the defendant's governmental authority derives, the defendant is not really being prosecuted for conduct of his own. He is a defendant only because his prosecution is one way of bringing before the courts a dispute between the President and the Congress. It is neither necessary nor fair to make him the pawn in a criminal prosecution in order to achieve judicial resolution of an interbranch dispute, at least where there is an alternative means for vindicating congressional investigative interests and for getting the legal issues into court.

Lee, *Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships,* 1978 B.Y U. L Rev. 231, 259.

[40] Even when a privilege is asserted by a cabinet official, and not the President, courts are extremely reluctant to impose a contempt sanction and are willing to resort to it only in extraordinary cases and only after all other remedies have failed. In *In re Attorney General,* 596 F.2d 58 (2d Cir.), *cert. denied,* 444 U.S. 903 (1979), the court granted the government's mandamus petition to overturn a district court's civil contempt citation against the Attorney General for failing to turn over documents for which he had asserted a claim of privilege. The court recognized that even a *civil* contempt sanction imposed on an Executive Branch official "has greater public importance, with separation of powers overtones, and warrants more sensitive judicial scrutiny than such a sanction imposed on an ordinary litigant." 596 F.2d at 64. Therefore, the court held that holding the Attorney General of the United States in contempt to ensure compliance with a court order should be a last resort, to be undertaken only after all other means to achieve the ends legitimately sought by the court have been exhausted. *Id.* at 65. In the case of a Presidential claim of executive privilege, there is even more reason to avoid contempt proceedings because the privilege claim has been made as a constitutionally based claim by the President himself and the sanction involved is criminal and not civil contempt. The use of criminal contempt is especially inappropriate in the context under discussion because Congress has the clearly available alternative of civil enforcement proceedings.

139

compelling need to employ criminal prosecution in order to vindicate its rights. The Executive, however, must be free from the threat of criminal prosecution if its right to assert executive privilege is to have any practical substance. Thus, when the major impact on the President's ability to exercise his constitutionally mandated function is balanced against the relatively slight imposition on Congress in requiring it to resort to a civil rather than a criminal remedy to pursue its legitimate needs,[41] we believe that the constitutionally mandated separation of powers requires the statute to be interpreted so as not to apply to Presidential assertions of executive privilege.[42]

The construction of the statute that is dictated by the separation of powers is consistent with the legislative history of the statute and the subsequent legislative implementation of the statute. Although at the time the criminal statute was enacted, Congress was well aware of the recurring assertions of the right to protect the confidentiality of certain Executive Branch materials, it gave no indication that it intended the contempt statute to tread upon that constitutionally sensitive area. In the many debates on executive privilege since the adoption of the statute, Congress at times has questioned the validity of a Presidential assertion of privilege, but, until December of 1982, it never attempted to utilize the criminal contempt sanction to punish someone for a President's assertion of privilege. Regardless of the merits of the President's action, the fundamental balance required by the Constitution does not permit Congress to make it a crime for an official to assist the President in asserting a constitutional privilege that is an integral part of the President's responsibilities under the Constitution. We therefore conclude that the contempt of Congress statute does not apply to an executive official who carries out the President's claim of executive privilege.

Nearly every President since George Washington has found that in order to perform his constitutional duties it is necessary to protect the confidentiality of certain materials, including predecisional Executive Branch deliberations, national security information, and sensitive law enforcement proceedings, from disclosure to Congress. No President has rejected the doctrine of executive privilege; all who have addressed the issue have either exercised the privilege, attested to its importance, or done both. Every Supreme Court Justice and every Judge of the United States Court of Appeals for the District of Columbia Circuit who has considered the question of executive privilege has recognized its validity and importance in the constitutional scheme. Executive privilege, properly asserted, is as important to the President as is the need for confidenti-

---

[41] See Hamilton and Grabow, A Legislative Proposal for Resolving Executive Privilege Disputes Precipitated by Congressional Subpoenas, 21 Harv. J. on Legis. 145 (1984).

[42] We believe that this same conclusion would apply to any attempt by Congress to utilize its inherent "civil" contempt powers to arrest, bring to trial, and punish an executive official who asserted a Presidential claim of executive privilege. The legislative history of the criminal contempt statute indicates that the reach of the statute was intended to be coextensive with Congress' inherent civil contempt powers (except with respect to the penalties imposed). See 42 Cong. Globe 406 (remarks of Rep. Davis). Therefore, the same reasoning that suggests that the statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well.

ality at certain times in the deliberations of the Justices of the Supreme Court and in the communications between members of Congress and their aides and colleagues. Congress itself has respected the President's need for confidentiality; it has never arrested an executive official for contempt of Congress for failing to produce subpoenaed documents and never, prior to the heated closing moments of the 97th Congress in December of 1982, did a House of Congress seek to punish criminally an executive official for asserting a President's claim of privilege.

Naturally, Congress has and always will resist claims of executive privilege with passion and vigor. Congress aggressively asserts its perceived institutional prerogatives, and it will surely oppose any effort by the President to withhold information from it. If it could eliminate claims of executive privilege by requiring that an official who asserts such a claim on behalf of the President be prosecuted criminally, it would surely be in favor of doing so. Thus, the tension between the relative strengths and institutional prerogatives of Congress and the President necessarily reaches a high level of intensity in any case involving a claim of executive privilege. The specter of mandatory criminal prosecution for the good-faith exercise of the President's constitutional privilege adds a highly inflammatory element to an already explosive environment. We believe that the courts, if presented the issue in a context similar to that discussed in this memorandum, would surely conclude that a criminal prosecution for the exercise of a presumptively valid, constitutionally based privilege is not consistent with the Constitution. The President, through a United States Attorney, need not, indeed may not, prosecute criminally a subordinate for asserting on his behalf a claim of executive privilege. Nor could the Legislative Branch or the courts require or implement the prosecution of such an individual.

In some respects, the tensions between the branches, which become exacerbated during these conflicts, and the pressure placed on the President and his subordinates in this context, call to mind the comments of Chief Justice Chase concerning the impeachment trial of President Andrew Johnson, over which the Chief Justice presided. One of the charges against President Johnson was that he had fired Secretary of War Stanton in violation of the Tenure of Office Act, which purported to strip the President of his removal power over certain Executive Branch officials.[43] Chief Justice Chase declared that the President had a duty to execute a statute passed by Congress which he believed to be unconstitutional "precisely as if he held it to be constitutional." However, he added, the President's duty changed in the case of a statute which

> directly attacks and impairs the executive power confided to him by [the Constitution]. In that case it appears to me to be the clear duty of the President to disregard the law, so far at least as it may be necessary to bring the question of its constitutionality before the judicial tribunals.

---

[43] The Tenure of Office Act was, of course, later declared to have been unconstitutional. *Myers* v. *United States*, 272 U.S. 52 (1926).

141

> How can the President fulfill his oath to preserve, protect, and
> defend the Constitution, if he has no *right* to *defend* it against an
> act of Congress, sincerely believed by him to have been passed
> in violation of it?[44]

If the President is to preserve, protect, and defend the Constitution, if he is faithfully to execute the laws, there may come a time when it is necessary for him both to resist a congressional demand for documents and to refuse to prosecute those who assist him in the exercise of his duty. To yield information that he in good conscience believes he must protect in order to perform his obligation, would abdicate the responsibilities of his office and deny his oath. To seek criminal punishment for those who have acted to aid the President's performance of his duty would be equally inconsistent with the Constitution.

In the narrow and unprecedented circumstances presented here, in which an Executive Branch official has acted to assert the President's privilege to withhold information from a congressional committee concerning open law enforcement files, based upon the written legal advice of the Attorney General, the contempt of Congress statute does not require and could not constitutionally require a prosecution of that official, or even, we believe, a referral to a grand jury of the facts relating to the alleged contempt. Congress does not have the statutory or constitutional authority to require a particular case to be referred to the grand jury. In addition, because the Congress has an alternative remedy both to test the validity of the Executive's claim of privilege and to obtain the documents if the courts decide that the privilege is outweighed by a valid and compelling legislative need, a criminal prosecution and the concomitant chilling effect that it would have on the ability of a President to assert a privilege, is an unnecessary and unjustified burden that, in our judgment, is inconsistent with the Constitution.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[44] R. Warden, *An Account of the Private Life and Public Services of Salmon Portland Chase* 685 (1874). Chief Justice Chase's comments were made in a letter written the day after the Senate had voted to exclude evidence that the entire cabinet had advised President Johnson that the Tenure of Office Act was unconstitutional. *Id. See* M. Benedict, *The Impeachment and Trial of Andrew Johnson* 154–55 (1973). Ultimately, the Senate did admit evidence that the President had desired to initiate a court test of the law. *Id.* at 156.